**TERRACE et al. v. THOMPSON, Attorney General of Washington.**

(District Court, W. D. Washington, S. D. July 25, 1921.)

No. 132–E.

1. **Injunction ⊜85(2)—Severity of punishment for violation of statute ground of equity jurisdiction to determine validity.**

A provision of a civil statute subjecting any person violating it to a year's imprisonment for an act otherwise lawful, *held* to justify a resort to equity to determine its validity.

2. **Aliens ⊜10—State may prohibit aliens from acquiring lands.**

A state may lawfully prohibit the acquiring of lands by aliens if there is no treaty to the contrary.

3. **Treaties ⊜11—Are paramount to state laws.**

If a state Constitution or statute conflicts with a treaty, it is either void or suspended during the existence of the treaty.

4. **Aliens ⊜13—Japanese treaty does not give right to lease agricultural lands.**

The provision of article 1 of the treaty between the United States and Japan (37 Stat. 1504), that citizens and subjects of each contracting party "shall have liberty * * * (in the territories of the other) to own or lease and occupy houses, manufactories, warehouses and shops, * * * to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade," *held* not to give the right to lease agricultural land, but to leave each state in the United States free to grant or prohibit such right to Japanese subjects.

5. **Aliens ⊜13—Farming not incidental to trading in farm products.**

The leasing of land for farming purposes is not incidental to trading, either wholesale or retail, in farm products.

6. **Constitutional law ⊜266(1)—Right to convey land to one prohibited from acquiring it by laws of state not a privilege or immunity.**

The Fourteenth Amendment to the Constitution *held* not to give a citizen the right to sell or lease land to an alien prohibited by the laws of the state from acquiring land by purchase or lease.

7. **Aliens ⊜10—Statute prohibiting ownership of land held valid.**

The Alien Land Act of Washington, which prohibits the purchase or lease of land by any alien who has not in good faith declared his intention to become a citizen, *held* constitutional and valid.

In Equity. Suit by Frank Terrace and Elizabeth Terrace, his wife, and N. Nakatsuka, against Lindsay L. Thompson, Attorney General of the State of Washington. On motion for preliminary injunction. Denied.

James B. Howe, E. Heister Guie, and Dallas V. Halverstadt, all of Seattle, Wash., for complainants.

Lindsay L. Thompson, Atty. Gen., pro se.

Before GILBERT, Circuit Judge, and CUSHMAN and NETERER, District Judges.

CUSHMAN, District Judge. The bill alleges that the complainants Terrace, owners of certain lands in this district, desire to lease such lands to the complainant Nakatsuka, a subject of Japan, who desires to lease them from them, and that he is engaged in farming and trad-

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ing wholesale and retail in farm products; that such lease will be prevented by defendant's enforcement of chapter 50, Laws of Washington 1921, commonly known as the "Alien Land Bill." It is alleged that the result will be that the complainant Nakatsuka—

"if he is prevented from leasing land for the purpose of producing such farm products for such trade, * * * will be prevented from engaging in trade and the incidents to trade as he is authorized to do under the treaty hereinafter mentioned."

It is alleged that the act in question is contrary to the Fourteenth Amendment to the Constitution of the United States, to article 1 of the treaty with Japan (37 Stat. 1504), and to section 33, art. 2, of the Constitution of the state of Washington.

[1] The act provides, not only for the forfeiture of the lands affected, but that whoever conveys lands to an alien shall be guilty of a gross misdemeanor, the punishment for which may be a year's imprisonment in jail. This, we conclude, is such a severe punishment as to prevent persons affected from resorting to the courts to determine the validity of the statute in question, and that, therefore, the remedy at law is not sufficient. Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764. The remedy at law is also inadequate as to the complainant Nakatsuka. Raich v. Truax (D. C.) 219 Fed. 273, at page 283.

Rast v. Van Deman & Lewis, 240 U. S. 342, 355, 368, 36 Sup. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455, and Tanner v. Little, 240 U. S. 369, 36 Sup. Ct. 379, 60 L. Ed. 691, have no application. In those cases the statute attacked required the payment of a license fee. In such cases an adequate remedy at law exists, because, after payment of the license tax, suit can be had for its repayment. For the same reason McCormack Bros. Co. v. Tacoma (D. C.) 201 Fed. 374, is inapplicable, as well as for the further reason that the plaintiff in such case was a corporation which could not be imprisoned for failure to pay the license, being only liable for the payment of a small fine. In such a case the remedy at law would not, necessarily, be inadequate.

The Constitution of the state of Washington provides:

"The ownership of lands by aliens, other than those who in good faith have declared their intention to become citizens of the United States, is prohibited in this state, except where acquired by inheritance, under mortgage or in good faith in the ordinary course of justice in the collection of debts; and all conveyances of lands hereafter made to any alien directly, or in trust for such alien, shall be void: Provided, that the provisions of this section shall not apply to lands containing valuable deposits of minerals, metals, iron, coal, or fire clay, and the necessary land for mills and machinery to be used in the development thereof and the manufacture of the products therefrom. Every corporation, the majority of the capital stock of which is owned by aliens, shall be considered an alien for the purposes of this prohibition." Section 33, art. 2.

The act in question defines "land" as follows:

" 'Land' does not include lands containing valuable deposits of minerals, metals, iron, coal or fire clay or the necessary land for mills and machinery

to be used in the development thereof and the manufacture of the products therefrom, but does include every other kind of land and every interest therein and right to the control, possession, use, enjoyment, rents, issues or profits thereof except a mortgage and except a right to the possession, use or enjoyment of land for a period of not more than ten years for a purpose for which an alien is accorded the use of land by a treaty between the United States and the country whereof he is a citizen." Laws 1921, c. 50, p. 156, § 1 (b).

Under the foregoing language, it is not necessary to consider the question of whether at common law a leasehold interest is personalty or realty, for, without doubt, by the foregoing, it is intended to include leases of agricultural lands.

The act also provides:

" 'Alien' does not include an alien who has in good faith declared his intention to become a citizen of the United States, but does include all other aliens and all corporations and other organized groups of persons a majority of whose capital stock is owned or controlled by aliens or a majority of whose members are aliens." Section 1 (a).

There is nothing in the bill as to the length of time for which complainant Nakatsuka desires to lease the lands, or for which it will be necessary to lease them.

There is no allegation in the bill as to whether the complainant Nakatsuka has or has not declared his intention to become a citizen of the United States. All that is disclosed by the bill touching his eligibility for citizenship is the allegation that he is a subject of the Emperor of Japan. There is a possibility that, included among the subjects of the Emperor, there are Caucasians, or "white persons."

Congress has, by section 2169, R. S. (U. S. Comp. Stat. § 4358), limited the right of naturalization to those aliens being "free white persons, and to aliens of African nativity and to persons of African descent."

We feel justified in considering the bill as though it were alleged that Nakatsuka had the prevailing ethnological characteristics of his fellow subjects, and that he had not declared his intention to become a citizen. He is, therefore, not a "white person," within the meaning of section 2169, R. S. (U. S. Comp. Stat. § 4358). In re Young (D. C.) 198 Fed. 715; In re Saito (C. C.) 62 Fed. 126; In re Geronimo Para (D. C.) 269 Fed. 643.

Nakatsuka not being eligible to citizenship under the law as it now stands, even if such complainant had filed, or sought to file, a declaration of intention to become a citizen, he could not—considering the present uniformity in the decisions—fairly be said to have done so "in good faith."

[2] A state may lawfully prohibit aliens acquiring land within its boundaries, if there is no treaty to the contrary. Chirac v. Chirac, 2 Wheat. 259, 272, 4 L. Ed. 234; Hauenstein v. Lynham, 100 U. S. 483, 484, 25 L. Ed. 628; De Vaughn v. Hutchinson, 165 U. S. 566, 570, 17 Sup. Ct. 461, 41 L. Ed. 827; Clarke v. Clarke, 178 U. S. 186, 20 Sup. Ct. 873, 44 L. Ed. 1028; Blythe v. Hinckley, 180 U. S. 333, 21 Sup. Ct. 390, 45 L. Ed. 557.

[3] If a state Constitution or statute conflicts with the treaty, it is either void or suspended during the existence of the treaty, for by article 6 of the Constitution of the United States it is provided:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and *all treaties made*, or which shall be made, *under the authority of the United States*, *shall be the supreme law of the land*, and the judges in every state shall be bound thereby, *anything in the Constitution or laws of any state to the contrary notwithstanding.*"

See Martin v. Hunter, 1 Wheat. 304, 4 L. Ed. 97; Carneal v. Banks, 10 Wheat. 181, 6 L. Ed. 297; Hopkirk v. Bell, 3 Cranch, 454, 2 L. Ed. 497; Geofroy v. Riggs, 133 U. S. 258, 10 Sup. Ct. 295, 33 L. Ed. 642; Ware v. Hylton, 3 Dall. 199, 1 L. Ed. 568; Chirac v. Chirac, 2 Wheat. 259, 4 L. Ed. 234; Hauenstein v. Lynham, 100 U. S. 483, 488, 25 L. Ed. 628; Missouri v. Holland, 252 U. S. 416, 434, 40 Sup. Ct. 382, 64 L. Ed. 641, 11 A. L. R. 984; In re Stixud's Estate, 58 Wash. 339, 109 Pac. 343, 33 L. R. A. (N. S.) 632, Ann. Cas. 1912A, 850; State ex rel. Tanner v. Staeheli (Wash.) 192 Pac. 991.

[4] This brings us to the question of the terms of the treaty with Japan with which the act alleged by the bill to conflict. The only portion of the treaty material to be considered is that part of article 1 providing:

"The citizens or subjects of each of the high contracting parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established." 37 Stat. at L. p. 1504.

The lasting impression created by the foregoing language is that it was intended to withhold the right to own or lease agricultural lands. This impression becomes fixed upon consideration of the fact that this, in substance, was true at common law. Coke upon Littleton, bk 12b.

A law of California (Laws of 1913, c. 113) is, in its general purport, similar to the act here in question, although by section 2 of that act aliens were permitted to lease lands for a term of not over three years. A controversy arose concerning the validity under the treaty of the California act between the Department of Foreign Affairs for the Empire of Japan and our own Secretary of State. In the progress of the exchange of views between the officials so representing the two governments, the Secretary of State found the act not to violate the treaty and, in part, said:

"This treaty was based upon a draft presented by the Imperial Government. In article I of this draft there is found the following clause: '3. They (the citizens or subjects of the contracting parties) shall be permitted to own or hire and occupy the houses, manufactories, warehouses, shops and premises which may be necessary for them, and to lease land for RESIDENTIAL, COMMERCIAL, INDUSTRIAL, MANUFACTURING and other lawful purposes.'

"It will be observed that in this clause, which was intended to deal with the subject of real property there is no reference to the ownership of land.

The reason of this omission is understood to be that the Imperial Government desired to avoid treaty engagements concerning the ownership of land by foreigners and to regulate the matter wholly by domestic legislation.

"In the treaty as signed the rights of the citizens and subjects of the contracting parties with reference to real property were specifically dealt with (article I) in the stipulation that they should have liberty 'to own 'or lease and occupy houses, manufactories, warehouses and shops' and 'to lease land for residential and commercial purposes.' IT THUS APPEARS THAT THE RE-CIPROCAL RIGHT TO LEASE LAND WAS CONFINED TO 'RESIDENTIAL AND COMMER-CIAL PURPOSES,' AND THAT THE PHRASES 'INDUSTRIAL' AND 'OTHER LAWFUL PURPOSES,' *which would have included the leasing of* AGRICULTURAL LANDS, WERE OMITTED.

"The question of the ownership of land was, in pursuance of the desire of the Japanese government, dealt with by an exchange of notes in which it was acknowledged and agreed that this question should be regulated in each country by the local law and that the law applicable in the United States in this regard was that of the respective states. This clearly appears from the note of Baron Uchida to Mr. Knox of February 21, 1911, in which, in reply to an inquiry of the latter on the subject, Baron Uchida said: 'In return for the rights of land ownership which are granted Japanese by the laws of the various states of the United States (of which, I may observe, there are now about thirty) the Imperial Government will by liberal interpretation of the law be prepared to grant land ownership to *American citizens from all the states, reserving, for the future, however, the right of maintaining the condition of reciprocity with respect to the separate states.*'

"In quoting the foregoing passage I have italicized the last clause for the purpose of calling special attention to the fact that the contracting parties distinctly understood that, in conformity with the express declaration of the Imperial Japanese ambassador, the right was reserved to maintain as to land ownership the condition of reciprocity in the sense that citizens of the United States, coming from states in which Japanese might not be permitted to own land, were to be excluded from the reciprocal privilege in Japan.

"From what has been pointed out it appears to result, first, that the California statute, in extending to aliens not eligible to citizenship of the United States the right to lease lands in that state for agricultural purposes for a term not exceeding three years, *may be held to go beyond the measure of privilege established in the treaty, which does not grant the right to lease* AGRICULTURAL LANDS AT ALL; and, secondly, that, so far as the statute may abridge the right of such aliens to own lands within the states the right has been reserved by the Imperial Government to act upon the principle of exact reciprocity with respect to citizens of the individual states. In a word, the measure of privilege and the measure of satisfaction for its denial were perfectly understood and accepted." Letter of William Jennings Bryan to Viscount Chinda July 16, 1912, "Annex No. 7," pp. 17 and 18. "Controversy—United States and Japan—California Question," Congressional Library JV 6888 C2 J4. (Italics ours.)

In the case of Sullivan v. Kidd, decided January 3, 1921, 41 Sup. Ct. 158, at page 162, 254 U. S. 433, at page 442 (65 L. Ed. ——), the court said:

"While the question of the construction of treaties is judicial in its nature, and courts, when called upon to act should be careful to see that international engagements are faithfully kept and observed, the construction placed upon the treaty before us and consistently adhered to by the Executive Department of the government, charged with the supervision of our foreign relations, should be given much weight."

A clear intention being shown not to supersede, in the particular now in question, the state's authority to regulate the rights of title and

possession in lands within its boundaries, that intent may not be defeated by the claim now made that complainant Nakatsuka's business of farming is incidental to his business as a wholesale and retail trader in farm products, for there is no more reason for considering farming an incident of the latter than for considering the latter an incident of the former. The language of the treaty is:

"And generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects. * * *" 37 Stat. at L. 1504.

[5] In the most liberal construction of this language that may be indulged in, it cannot fairly be said that truck farming is incidental to trading, either wholesale or retail, in the products of a farm, any more than conducting a sheep ranch or growing mulberry trees is incidental to the dry goods trade. Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346; U. S. v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325; Joyce v. Auten, 179 U. S. 591, 594, 21 Sup. Ct. 227, 45 L. Ed. 332; Capital City Dairy Co. v. Ohio, 183 U. S. 238, 245, 22 Sup. Ct. 120, 46 L. Ed. 171. Buchanan·v. Warley, 245 U. S. 60, 73, 38 Sup. Ct. 16, 62 L. Ed. 149, L. R. A. 1918C, 210, Ann. Cas. 1918A, 1201, is, no doubt, authority supporting the right of Terrace to invoke this treaty provision, were the act in conflict with the treaty, but it is not.

[6] Aliens may only come to the United States upon such conditions and terms as our government sees fit to impose. By the treaty, the right to lease real estate in the United States for agricultural purposes is withheld. Hauenstein v. Lynham, 100 U. S. 483, 25 L. Ed. 628. It might have been, by Congressional enactment, prohibited (U. S. v. De Repentigny, 72 U. S. [5 Wall.] 211, 18 L. Ed. 627); but, by the treaty, it was neither granted nor prohibited. It was merely withheld, which left the state free to prohibit it. The United States might have excluded all of the subjects of Japan; but rather chose to admit them, withholding the right to lease agricultural lands, thereby recognizing the right of the state to prohibit it, or regulate it. That purpose is not to be defeated by allowing the citizen landowner the broad construction of his rights under the Fourteenth Amendment for which contention is made. The citizen landowner may sell to whom he pleases; but he may not sell to one who is rightfully forbidden the right to buy.

That the Fourteenth Amendment was not intended as an instrument to accomplish the end here sought, is shown by legislation early enacted by Congress to give effect to the Fourteenth Amendment, the primary purpose of which was the enfranchisement of the slaves. Slaughterhouse Cases, 16 Wall. (83 U. S.) 36, 21 L. Ed. 394; Buchanan v. Warley, 245 U. S. 60, at pages 76 and 78, 38 Sup. Ct. 16, 62 L. Ed. 149, L. R. A. 1918C, 210, Ann. Cas. 1918A, 1201. By the amendment, members of the enfranchised race were made citizens of the nation and state of their residence, a privilege at present denied to the subjects of Japan.

"In giving legislative aid to these constitutional provisions Congress enacted in 1866 chapter 31, § 1, 14 Stat. 27 (Rev. Stats. § 1978), that: '*All citizens* of the United States shall have the same right in every state and territory, as is enjoyed by white citizens thereof to inherit, *purchase, lease, sell, hold, and convey real and personal property.*

"And in 1870, by chapter 114, § 16, 16 Stat. 144 (Rev. Stats. § 1977), that: "*All persons* within the jurisdiction of the United States shall have the same right in every state and territory *to make and enforce contracts*, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and no other." Buchanan v. Warley, 245 U. S. 60, at page 78, 38 Sup. Ct. 16, at page 19, 62 L. Ed. 149, L. R. A. 1918C, 210, Ann. Cas. 1918A, 1201. (Italics those of this court.)

These statutes show that Congress then understood the Fourteenth Amendment did not forbid the state the right to deny ownership of lands within its boundaries to aliens.

[7] The act of 1897 (U. S. Comp. Stats. §§ 3490-3495), prohibiting the ownership of land by aliens in the territories of the United States, provides that the denial of such rights shall not apply to any alien who shall become a bona fide resident of the United States. By section 3491, Comp. Stats., Congress gave all alien bona fide residents, including the Japanese, rights denied by the act in question; but it is limited to the territories and has no application in the states. The court in Buchanan v. Warley, supra, holding the state statute unconstitutional, accentuated the fact that the discrimination of the statute was "solely because of color," and, again, "this interdict is based wholly upon color, simply that and nothing more."

In the course of the controversy between the State Department and the Minister for Foreign Affairs of the empire of Japan over the validity of the California statute under the treaty already mentioned, the legal adviser for the State Department said:

" * * * The statute contains no discrimination against Japanese as such, but applies equally to all aliens not eligible to citizenship." "Annex No. 8," p. 24, "Aide Memoire, Wash. July 16, 1913," "Controversy—United States and Japan—California Question."

Still less does the Washington act discriminate against the Japanese, for it provides that—

" 'Alien' does not include an alien who has in good faith declared his intention to become a citizen of the United States."

The prohibition by this definition is made applicable to all aliens, both those eligible and those not eligible to citizenship, provided that they have not declared their intention to become citizens. To this extent, the present suit is to be distinguished from In re Ah Chong (C. C.) 2 Fed. 733. In the latter case, Judge Sawyer held invalid a California law providing:

" * * * All aliens incapable of becoming electors of this state are hereby prohibited from fishing, or taking any fish, lobsters, shrimps, or shellfish of any kind, for the purpose of selling or giving to another person to sell. Every violation of the provisions of this act shall be a misdemeanor, punishable upon

conviction by a fine of not less than $25, or by imprisonment in the county jail for a period of not less than thirty days." 2 Fed. at page 734.

Of this act, the court says:

"* * * To exclude the Chinaman from fishing in the waters of the state, therefore, while the Germans, Italians, Englishmen, and Irishmen, who otherwise stand upon the same footing, are permitted to fish ad libitum, without price, charge, let, or hindrance, is to prevent him from enjoying the same privileges as are 'enjoyed by the citizens or subjects of the most favored nation'; and to punish him criminally for fishing in the waters of the state, while all aliens of the Caucasian race are permitted to fish freely in the same waters with impunity and without restraint, and exempt from all punishments, is to exclude him from enjoying the same immunities and exemptions 'as are enjoyed by the citizens or subjects of the most favored nation;' and such discriminations are in violation of articles 5 and 6 of the treaty with China, cited in full in Parrott's Case. The same privileges which are granted to other aliens, by treaty or otherwise, are secured to the Chinaman by the stipulations of the treaty. Conceding that the state may exclude all aliens from fishing in its waters, yet if it permits one class to enjoy the privilege it must permit all others to enjoy, upon like terms, the same privileges, whose governments have treaties securing to them the enjoyment of all privileges granted to the most favored nation.

"The Fourteenth Amendment of the national Constitution provides that 'no state shall * * * deny to any person within its jurisdiction the equal protection of the laws.' To subject the Chinese to imprisonment for fishing in the waters of the state, while aliens of all European nations under the same circumstances are exempt from any punishment whatever, is to subject the Chinese to other and entirely different punishments, pains, and penalties than those to which others are subjected, and it is to deny to them the equal protection of the laws, contrary to those provisions of the Constitution." 2 Fed. at pages 736 and 738.

The present case is not only to be distinguished from the Chong Case because of the fact that the present law is made applicable to all aliens and there is no punishment by imprisonment or a fine of the alien grantee of lands, but the case is to be further distinguished because of the fact that the treaty with Japan does not contain, as to land ownership, the "most favored nation" clause or any language of such import.

The fourteenth article of the treaty contains the general favored nation clause:

"*Except as otherwise expressly provided* in this treaty the high contracting parties agree that, *in all that concerns commerce and navigation,* any privilege, favor or immunity which either contracting party has actually granted, or may hereafter grant, to the citizens or subjects of any other state shall be extended to the citizens or subjects of the other contracting party gratuitously, if the concession in favor of that other state shall have been gratuitous, and on the same or equivalent conditions, if the concession shall have been conditional." 37 Stats. at L. 1507. (The italics are those of this court.)

In view of the limitation of this clause to "all that concerns commerce and navigation," it is clear that the privileges secured by article 14 do not apply to the limited rights granted by article 1, already quoted, in which the right to lease land is limited to that for residential and commercial purposes.

Neither Guinn and Beal v. United States, 238 U. S. 347, 35 Sup. Ct. 926, 59 L. Ed. 1340, L. R. A. 1916A, 1124, nor Myers v. Anderson, 238 U. S. 368, 35 Sup. Ct. 932, 59 L. Ed. 1349, have any application to the present controversy, for, if it be granted that the present law is aimed primarily at the so-called yellow or brown races of the Orient, the result is the same. There is no restriction upon the authority of Congress to discriminate in the matter of the eligibility of an alien to become a citizen because of color. The Fifteenth Amendment provides that the right of a citizen of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude. The Fourteenth Amendment made the negroes citizens.

It is obvious that the objection on the part of Congress is not due to color, as color, but only to color as an evidence of a type of civilization which it characterizes. The yellow or brown racial color is the hallmark of Oriental despotisms, or was at the time the original naturalization law was enacted. It was deemed that the subjects of these despotisms, with their fixed and ingrained pride in the type of their civilization, which works for its welfare by subordinating the individual to the personal authority of the sovereign, as the embodiment of the state, were not fitted and suited to make for the success of a republican form of Government. Hence they were denied citizenship. In re Ah Yup, 1 Fed. Cas. 223, No. 104. It is this disqualification put upon them by the federal government to which the state objects, and not their color, although the federal government may have made their race color the irrefutable evidence of disqualification for citizenship.

Congress, in withholding the right to citizenship from these Oriental races, no doubt recognized, as statesmen long have done, that it was of the essence of its duty to insure the perpetuation of our own type of civilization. It has been well said:

"The last two generations have seen an enormous change in the vision of life wider and deeper than it has ever been comprehended before, and as our knowledge has grown, the narrow utilitarianism has shriveled off us, and we see the use and value and nobility of lands and ages far outside the scope of our forefathers. * * * We do not look on them as wrong in differing from ourselves. We begin to understand that they are each adapted to the country and people to which they belong, and we are not so certain that we can improve everybody by trying to make them imitate us."

The sympathetic and temperate view here expressed, no doubt, should restrain us from forcing our civilization upon alien types. Yet it lessens no jot or tittle the duty of the court to hold impregnable the barrier erected by Congress to preserve, in its purity, our own type of civilization. The more homogeneous its parts, the more perfect the union. It may be that the changes wrought in the Orient in the last 50 or 75 years now warrant a different policy; but there is no law or treaty that yet has said "the twain shall meet," or that, if citizenship be accorded these Orientals, the danger is past of our becoming a "mechanical medley of race fragments."

It is obvious that one who is not a citizen and cannot become one lacks an interest in, and the power to effectually work for the welfare

274 F.—54

of, the state, and, so lacking, the state may rightfully deny him the right to own and lease real estate within its boundaries. If one incapable of citizenship may lease or own real estate, it is within the realm of possibility that every foot of land within the state might pass to the ownership or possession of noncitizens. Such a result would leave the foundation of the state but a pale shadow, and the structure erected thereon but a Tower of Babel, from which the tenants in possession might, when the shock of war came, bow themselves out, because they were not bound as citizens to defend the house in which they lodged.

This is no new thing. Tribal laws of the progenitors of the Anglo-Saxons, while still upon the continent, made an estate in lands, similar to a freehold, a prerequisite to a voice in the tribal government. The "free-necked man," or "freeman," was synonymous with "freeholder." They were interdependent. A freeman had a vote in determining tribal policies, and no one was a freeman without an estate in lands. Green's History of the English People, book 1, chapter 1, subhead "The Land." The recognition of this principle has run throughout the history of our race and its governments. Section 33, article 2, of the Constitution of the state of Washington, provides:

"The ownership of lands by aliens, other than those who in good faith have declared their intention to become citizens of the United States, is prohibited in this state, except where acquired by inheritance, *under mortgage or in good faith in the ordinary course of justice in the collection of debts*; and all conveyances of lands hereafter made to any alien directly, or in trust for such alien, shall be void: Provided, That the provisions of this section shall not apply to lands containing valuable deposits of minerals, metals, iron, coal or fire clay, and the necessary land for mills and machinery to be used in the development thereof and the manufacture of the products therefrom. Every corporation, the majority of the capital stock of which is owned by aliens, shall be considered an alien for the purposes of this prohibition."

In Oregon Mortgage Co. v. Carsten's, 16 Wash. 165, 47 Pac. 421, 35 L. R. A. 841, it was held that an alien corporation, which had taken a mortgage, had the right to take a deed to the mortgaged land from the citizen mortgagor. As the above section excepts from its prohibition lands acquired "under mortgage or in good faith in the ordinary course of justice in the collection of debts," the court held that this exception did not require "a proceeding in court in the case of a mortgaged debt." Goon Gan v. Richardson, 16 Wash. 373, 47 Pac. 762, was also an alien mortgagee case, in which the court held that the incapacity to own land can only be shown at the suit of the state.

State ex rel. Winston v. Morrison, 18 Wash. 664, 52 Pac. 228, was a suit in which the court held a 99-year lease of real estate amounted to "ownership," as that word was used in the above-quoted section. In State ex rel. Winston v. Hudson Land Co., 19 Wash. 85, 52 Pac. 574, 40 L. R. A. 430, the holding was the same as to a 49-year lease. In State ex rel. Morrell v. Superior Court, 33 Wash. 542, 74 Pac. 686, it was held that an alien corporation could not acquire real estate in the state of Washington by eminent domain.

Abrams v. State of Washington, 45 Wash. 327, 88 Pac. 327, 9 L. R. A. (N. S.) 186, 122 Am. St. Rep. 914, 13 Ann. Cas. 527, hold that the grantor in a deed of real estate to an alien could not recover the real estate; that the state alone could invoke rights on account of the disability of the grantee under the above section, and that, the alien having died before the state sought to escheat the lands, the heirs, although themselves aliens, were entitled to inherit the lands, as well as citizens, under the express exception in the Constitution; and that the state, to succeed, must proceed while the lands were still in possession of the alien wrongfully acquiring them. In State ex rel. Atkinson v. World Real Estate Commercial Co., 46 Wash. 104, 89 Pac. 471, it was held that, as the alien had conveyed the lands prior to the institution of proceedings to escheat, the state had lost such right. Prentice v. How, 84 Wash. 136, 146 Pac. 388, was a decision to the same effect.

In State ex rel. Tanner v. Staeheli (Wash.) 192 Pac. 991, decided September 3, 1920, the lands were escheated, although the alien had, at the time of acquiring the land, believed himself a citizen, and had in good faith exercised the rights and privileges of citizenship, and had, after the proceedings of the state to escheat, filed his declaration to become a citizen. State ex rel. Tanner v. Rychen (Wash.) 193 Pac. 220, decided November 1, 1920, is a decision to the same effect.

From the foregoing, it is clear that the Supreme Court of Washington has held the common law only changed by this constitutional provision to the extent plainly expressed therein. The exceptions in the constitutional provision constitute a grant to the alien, and, of course, are not subject to legislative change or limitation, at least by the state. But it does not follow, because the Constitution prohibits alien "ownership" of lands with certain exceptions, that, the Constitution not having defined what shall constitute ownership, the Legislature may not do so. The Legislature is not bound to leave the courts to speculate upon that subject. In fact, the act of the Legislature but follows the common law:

"But as to a lease for yeares, there is a diversitie betweene a lease for yeares of a house for the habitation of a merchant stranger being an alien, whose king is in league with ours, and a lease for yeares of lands, meadows, pastures, woods and the like. For if he take a lease for yeares of lands, meadows, etc. upon office found, the king shall have it. But of a house for habitation he may take a lease for yeares as incident to commerce; for without habitation he cannot merchandise or trade. But if he depart, or relinquish the realme, the king shall have the lease. So it is if he die possessed thereof neither his executors or administrators shall have it, but the king; for he had it only for habitation as necessary to his trade or traffique and not for the benefit of his executor or administrator. But if the alien be no merchant, then the king shall have the lease for yeares, albeit it were for his habitation; and so it is if he be an alien enemie. And all this was so resolved by the judges assembled together for that purpose in the case of Sir James Croft. Pasch. 29, of the raigne of queene Elizabeth." Coke upon Littleton, book 1, chapter 1, 2b, subhead "Of Fee Simple."

The most the act in question does is no more than to invoke a rule of strict construction against the alien as to the meaning of the word "ownership" as appearing in the Constitution.

We find the other questions raised as to the validity of this statute to be without merit.

The preliminary injunction prayed is denied.

GILBERT, Circuit Judge, and NETERER, District Judge, concur.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes