[No. 17285. Department One. October 14, 1922.]

THE STATE OF WASHINGTON, *Appellant,* v.
E. J. O'CONNELL *et al., Respondents.*[1]

ALIENS (3) — REAL PROPERTY — CONSTITUTIONAL AND STATUTORY
RESTRICTIONS. In the absence of a treaty, a state may prohibit aliens
from owning or acquiring any lands or interest therein; and it was
competent, by Rem. Comp. Stat., § 10582, to define "lands" to include
"the right to any benefit" of lands.

ALIENS (3) — CONVERSION (1) — EQUITABLE CONVERSION — REAL
PROPERTY AS PERSONALTY—STATUTES. The doctrine of equitable con-
version is not available to validate a trust agreement violating the
anti-alien land laws, whereby lands are to be held by trustees for
a term of years, and, together with accruing income, to be dis-
tributed at the end of the period to aliens; since the doctrine is but
a fiction to accomplish manifest justice, and not to circumvent the
public policy of the state.

SAME. Such a trust agreement would not bring the matter with-
in the doctrine of equitable conversion where there was a provision
by which subsequent agreements or modifications in the trust could
result in conveyance of the title to the aliens; since the doctrine
only applies where there is an imperative direction to convert the
property and change its character.

ALIENS (5)—TREATIES (3)—OPERATION AND EFFECT. The treaty
between Great Britain and the United States, 31 U. S. Stats. at
Large, p. 1939, article 2, relating to the right of disposition and
succession of personal property, is not violated by Rem. Comp.
Stat., § 10582, of the anti-alien land laws, and defining "lands" to
include every interest in lands and the "rents, issues or profits
thereof."

Appeal from a judgment of the superior court for
King county, Gilliam, J., entered March 23, 1922, dis-
missing an action to escheat alien lands, upon sustain-
ing a demurrer to the complaint. Reversed.

*Malcolm Douglas, Arthur Schramm, Jr.,* and *Bert C.
Ross,* for appellant.

*Pierce Lonergan,* for respondents.

*The Attorney General, amicus curiae.*

[1]Reported in 209 Pac. 865.

BRIDGES, J.—This case concerns the anti-alien land law of the state of Washington, being ch. 50 of the Laws of 1921, p. 156. It will be necessary, even at the risk of making this opinion of undue length, to set out in considerable detail the constitutional and statutory provisions governing the question, and also the declaration of trust hereinafter mentioned.

Section 33 of our constitution, so far as it affects this case, reads as follows:

"The ownership of lands by aliens, other than those who in good faith have declared their intention to become citizens of the United States, is prohibited in this state, except where acquired by inheritance, under mortgage or in good faith in the ordinary course of justice in the collection of debts; and all conveyances of lands hereafter made to any alien directly, or in trust for such alien, shall be void. . . ." (Art.)

Section 2, ch. 50, p. 157, Laws of 1921 (Rem. Comp. Stat., § 10582), reads as follows:

"An alien shall not own land or take or hold title thereto. No person shall take or hold land or title to land for an alien. Land now held by or for aliens in violation of the constitution of the state is forfeited to and declared to be the property of the state. Land hereafter conveyed to or for the use of aliens in violation of the constitution or of this act shall thereby be forfeited to and become the property of the state."

By this act, an "alien" is defined as one who has not declared his intention to become a citizen of the United States. It defines "land" as not including lands containing valuable deposits of minerals, etc., "but does include every other kind of land and every interest therein and right to the control, possession, use, enjoyment, rents, issues or profits thereof. . ." The word "own" is defined to mean "the legal or equitable title to or the right to any benefit of" land; and the word

"title" includes "every kind of legal or equitable title."

After the passage and going into effect of this statute, certain land was deeded to the respondents, J. D. O'Connell and Pierce Lonergan, as trustees, and they made, executed, acknowledged and caused to be recorded a declaration of trust, which shows that they hold the land in question (which is residential and non-mineral property in the county of King, in the state of Washington) for the benefit of the *cestuis que trust* upon the following terms:

"1. In trust to convert the same into money and distribute the net proceeds thereof among the persons at the time of such conversion holding and owning beneficial interests therein, as evidenced by the receipt certificates issued by the Trustees as hereinafter provided; it being however expressly understood and agreed that the Trustees may, in their uncontrolled discretion, defer or postpone such conversion or distribution, except that the same shall not be postponed beyond the end of twenty years from July 1, 1921. During such postponement, and until such conversion, the interests of the *cestui que trusts* shall be considered for purposes of transmission and otherwise as personal property.

"2. In trust, pending final conversion and distribution of the property, to manage and control the same, the Trustees having for such purposes and for all purposes of sale, lease, mortgage, exchange, improvement and development, and any and all arrangements, contracts and dispositions of the trust property, or any part thereof, all and as full discretionary powers and authority as they would have if they were themselves the sole and absolute beneficial owners thereof in fee simple.

"3. In trust to collect and receive all rents and income from the property, the Trustees in this connection having full authority from time to time to use any funds on hand, whether received as capital or

income, for purposes of any repair, improvement, protection or development, of the property held hereunder, or the acquisition of other property as the Trustees may determine to be wise and expedient, for the protection and development of the trust property as a whole pending its conversion and distribution. The determination of the Trustees made in good faith as to all questions as between 'capital' and 'income' shall be final.

"4. This trust is declared in favor and for the benefit of E. J. O'Connell and D. P. O'Connell, a minor, each having a one-half beneficial interest as shown by certificates of interest which shall be issued to each of them by the undersigned Trustees; which certificates and all others which may be hereafter issued in exchange or substitution therefor shall be deemed parts hereof and conclusive evidence of the ownership of respective interests in this Trust; and the Trustees shall from time to time on request (on surrender of the old) issue such new certificates as may be proper or necessary to evidence any new or subdivided interests. . . . .

"6. The Trustees may employ all such agents and attorneys as they may think proper and find expedient, and prescribe their powers and duties.

"7. The Trustees shall at all times keep full and proper books of account and records of their proceedings and doings, and shall, at least annually, render account of the Trust to any beneficiary requesting the same, but no Trustee serving hereunder shall be obliged to give any bond, nor shall any Trustee have any liability except for the results of his own gross negligence or bad faith. . . . .

"9. The Trustees shall be entitled to receive reasonable compensation for service not exceeding a total of one per cent, reckoned upon the gross income received by them as such, unless at any time a majority in interests of the cestui que trusts consent in writing to some larger compensation for any past service; but in no event are they to receive less than $50.00 per year each. The Trustees shall also be entitled to reim-

18—121 Wash.

bursement and indemnification from the trust property for all their proper expenses and liabilities, and shall be entitled at all times to the advice of counsel; and traveling expenses shall be considered proper expenses. . . . .

"11. The terms and provisions of this Trust may be modified at any time or times by instruments in writing, signed, sealed and acknowledged by the then Trustees, assented to in writing by the cestuis que trusts and attached to the original of this instrument.

. . . .

"14. At the end of twenty years from and after July 1, 1921, (unless this trust shall heretofore have been otherwise lawfully terminated) all the property of every kind then held hereunder shall be sold by the Trustees and equitable distribution made of the net proceeds among the persons then entitled."

The state of Washington instituted suit for the purpose of escheating to itself an undivided one-half interest in the property. The complaint alleged the execution and set out the terms of the trust declaration, and further alleged that all of the transactions took place subsequently to the going into effect of the above mentioned 1921 law, and that E. J. O'Connell, one of the *cestuis que trust* mentioned in the trust declaration, was and is an alien, and has not declared his intention to become a citizen of the United States, and was and is a subject of the British Empire. The trial court sustained a demurrer to the complaint, and the state has appealed from a judgment dismissing the action.

The sole question before us is: does the trust arrangement above set out violate our anti-alien land act.

It has become the settled law of this country that, in the absence of a treaty to the contrary, a state may lawfully prohibit aliens from owning or acquiring any

lands, or any interest therein, within its borders. *Orr v. Hodgson,* 4 Wheat. (U. S.) 452; *Hauenstein v. Lynham,* 100 U. S. 483; *United States v. Repentigny,* 72 U. S. 211; *DeVaughn v. Hutchinson,* 165 U. S. 566; *Blythe v. Hinckley,* 180 U. S. 333; *Clarke v. Clarke,* 178 U. S. 186; *Jones v. Jones,* 234 U. S. 615; *Sullivan v. Kidd,* 254 U. S. 433.

Judge Cushman, in the recent case of *Terrace v. Thompson, Attorney General,* 274 Fed. 841, discussing another feature of this same statute, forcefully wrote concerning its purposes as follows:

"If one incapable of citizenship may lease or own real estate, it is within the realm of possibility that every foot of land within the state might pass to the ownership or possession of noncitizens. Such a result would leave the foundation of the state but a pale shadow, and the structure erected thereon but a Tower of Babel, from which the tenants in possession might, when the shock of war came, bow themselves out, because they were not bound as citizens to defend the house in which they lodged."

Our constitution provides that "the ownership of lands by aliens . . . is prohibited in this state . ." It was entirely within the province of the state legislature to determine by legislation what are lands, and when one becomes an owner thereof, within the meaning of the constitutional provision. In so doing, it has declared that "land" "does not include lands containing valuable mineral deposits," etc., "but does include every other kind of land and every interest therein and the right to the control, possession, use, enjoyment, rents, issues or profits thereof . ." and it has said that ownership includes "the right to any benefit of" lands.

For the purposes of this discussion, it may be conceded that, under the declaration of trust involved

here, the alien does not have the right to the control, possession and use of the lands involved, and that he does not own the legal or equitable title; but that he owns the "right to the benefit of" the land, and has the "right to" the "enjoyment, rents, issues and profits thereof," there cannot be any doubt. These rights are by the legislature defined to be land or an interest in or benefit of land, and they are most surely in violation, not only of the spirit of our legislative act, but the very words thereof. To hold that an alien may lawfully place the title to lands in this state in the name of someone else and yet be entitled to the income therefrom, would be to destroy the very object and purpose of the law, and make it possible, at very little inconvenience and cost, for the alien to circumvent it. For if one be entitled to the rents and issues of land, and also the sales price in which would be included any increase of value, he would have all the real substance of actual ownership, and would, at most, be deprived only of the actual legal title, personal possession and personal control. These might, with reasonable safety, be entrusted to someone else. If thereby he runs the risk of the honesty of the trustees, he finds the courts of the country open to him to protect him against any of their dishonest acts.

The respondents very earnestly insist that there is nothing in the trust declaration which says that the alien is to receive any of the rents, issues or profits. It may be conceded that there is not to be found within the instrument any express words which would bind the trustees to pay the rents and income to the alien, either periodically or at the termination of the trust. But it is expressly provided that the trustees shall "collect and receive all rents and income from the property . . ." and they are authorized to use any

money in their hands for repair, upkeep and expenses. But what is to become of the remainder of the income? Certainly the trustees are not personally entitled to those funds. Their compensation is fixed by another section of the trust declaration. They must, in good conscience, retain the unexpended portions of the rents, issues and profits for the benefit of the *cestuis que trust*. It is immaterial whether they must account for those funds and pay them annually or when the land is finally sold and the trust ended. The moneys arising from rents and income cannot lose their character as such simply by delay in the time of their payment. If they are rents and income when paid monthly, they are likewise rents and income when paid at any future period. If this instrument should be held valid and the trustees should refuse to account for the rents and profits found in their hands, the *cestuis que trust* would have no hesitancy in appealing to the courts of the country for the enforcement of their rights, and would doubtless be successfully heard. We have no doubt, therefore, that the rents, issues and profits which, by the statute, are declared to be land or an interest in land, and which the trustees are authorized and expected to collect from time to time, are held for the *cestuis que trust* and must—if not annually—ultimately be paid to them, less such sums as may have been properly expended under the terms of the trust declaration.

The respondents contend that the doctrine of equitable conversion must be controlling of this case. That question has been elaborately and learnedly briefed and argued by both sides, and by the *Attorney General* in an *amicus curiae* brief. While the doctrine may have some bearing in a general way on the question before us, yet we are convinced that a too elaborate discussion

of it would only serve to confuse the real point in issue, which is, a proper construction of the anti-alien land law, and its application to the facts of this case. In vol. 6 R. C. L., p. 1065, it is said:

"Equitable conversion may be defined as that constructive alteration in the nature of property by which in equity real estate is considered for certain purposes as personalty and transmissible and descendible as such, or personal estate as realty. It is an outgrowth of application of the old maxim that equity regards that as done which ought to be done, and therefore, to the operation of the doctrine it is essential that the property to be so treated should be subject to a trust or a clear and imperative direction for conversion."

And on the following page it is said:

"As the phrase itself implies, equitable conversion is a mere fiction of equity, the basic principle of which is that a court of equity, regarding the substance and not the mere form and circumstances of agreements and other instruments, considers things directed or agreed to be done as having been actually performed, where nothing has intervened which ought to prevent a performance."

A typical case is that of *Benham v. Taylor*, 5 How. (U. S.) 233. This case came from a state where there was a statute prohibiting aliens from owning lands. William F. Taylor's will provided that as soon as possible after his death all of his real estate and personal property should be, by his executors, converted into money, and after making certain bequests of money to various persons, he gave the remainder of his property to a brother and sister, who were aliens. It was contended that the will was void in so far as the aliens were concerned, because, under the statute, it was unlawful for them to take or hold real estate or any interest therein. The court, in substance, held that, in order to avoid an escheat and carry out the

wishes of the testator, a court of equity, if necessary, would consider land as money, where a testator, who was a trustee, has directed the land to be sold, and the will directs the proceeds to be given to the *cestuis que trust*.

How can that doctrine be of avail to the respondents? Equitable conversion is not a rule of law, but is a fiction which will be enforced only when necessary to accomplish manifest justice, and never to circumvent the public policy of the state as expressed in statutory form. The legislature is not bound by this legal fiction. It may repudiate it in whole or in part. It has declared that the rents, issues and profits are to be considered as land, or, at least, a beneficial interest in land, and thus there is no room left for the application of the doctrine of equitable conversion, even though it might be applied in a case of this character under a statute different from ours. The question here is not one of the application of an equitable fiction, but one of the construction of an act of the legislature. If the trust declaration comes within the letter or spirit of our statute, then it is void, notwithstanding the doctrine of equitable conversion.

But there is another reason why that doctrine is inapplicable to the facts of this case as pleaded. Mr. Pomeroy, in the 3rd volume of his work on Equity Jurisprudence, § 1160 (4th ed.), speaking of this doctrine says:

"The rule is therefore firmly settled, that in order to work a conversion *while the property is yet actually unchanged* in form, there must be a clear and imperative direction in the will, deed, or settlement, or a clear imperative agreement in the contract, to convert the property,—that is, to sell the land for money, or to lay out the money in the purchase of land. If the act of converting—that is, the act itself of selling the land or

of laying out the money in land—is left to the option, discretion, or choice of the trustees or other parties, then no equitable conversion will take place, because no *duty* to make the change rests upon them.''

All of the authorities seem to uphold this declaration of Mr. Pomeroy. In the declaration of trust involved here, there is no imperative agreement to convey the property. It is true, section one provides that the property shall be converted into money and distributed at some time within twenty years, but section eleven of the declaration practically nullifies this provision of the agreement, for it provides that,

''The terms and provisions of this trust may be modified at any time or times by instruments in writing, signed, sealed and acknowledged by the then trustees, assented to in writing by the cestuis que trust and attached to the original instrument.''

Under this provision, by agreement of all the parties concerned, any and all of the terms of the declaration of trust may be modified in such a way as that the alien might become the absolute owner of the property involved, and have the actual control and possession thereof. But the view we have already taken of this question makes it unnecessary to pursue this particular phase of the argument farther.

The respondents forcefully argue that the interpretation of the statute which we have given would be in violation of the treaty of 1899, between Great Britain and the United States, which instrument is found in vol. 31, U. S. Stats. at Large, p. 1939. Article one of the treaty is with reference to real estate, and provides that ''where, on the death of any person holding real property (or property not personal), within the territories of one of the Contracting Parties, such real property would, by the laws of the land, pass to a citizen or subject of the other were he not disqualified by the

laws of the country where such real property is situated,'' such citizen or subject shall be allowed a designated time within which to dispose of such property. Article two, being the one relied on by the respondents, is as follows:

"The citizens or subjects of each of the Contracting Parties shall have the power to dispose of their personal property within the territories of the other by testament, donation or otherwise; and their heirs, legatees and donees, being citizens or subjects of the other Contracting Party, whether resident or non-resident, shall succeed to their said personal property and may take possession thereof either by themselves or by others acting for them, and dispose of the same at their pleasure, paying such duties only as the citizens or subjects of the country where the property lies shall be liable to pay in like cases.''

It will be noticed that article two of the treaty is with reference to personal property—that is, property which may not fairly be considered real property. The respondents argue, however, that the state may not, by legislation, convert what is commonly and universally recognized as personal property into real estate or an interest therein and thereby cause an escheat, and that when the legislature undertook to declare rents, issues and profits to be "land" or beneficial interests in land, it violated the treaty provision.

It may be admitted that the legislature may not, by mere arbitrary definition, convert that which has always been known as personal property into real property, because such legislation would be in violation of the spirit of the treaty. But there are certain things which, in and by themselves, would be considered personal property; yet, because of their close and intimate connection with the land, may rightly be declared to be parts of, or interests in, the land. Such are rents, issues and profits derived from land, where ownership

or beneficial interest therein is prohibited as by the legislation under consideration.

We are convinced that the transaction we have been considering violates our anti-alien land law, and the court erred in sustaining the demurrer to the complaint and in dismissing the action. The judgment is reversed.

Parker, C. J., Fullerton, Mitchell, and Tolman, JJ., concur.