[No. 18686. Department One. June 10, 1924.]

## In the Matter of the Guardianship of FRANK T. FUJIMOTO.[1]

CONSTITUTIONAL LAW (101, 104)—ALIENS (3)—EQUAL PROTECTION OF THE LAWS—OWNERSHIP OF LAND. Rem. Comp. Stat., §§ 10581-10583, prohibiting aliens from leasing or acquiring any interest in real estate in the state of Washington, do not violate the Federal and state constitutional inhibitions against the denial of the equal protection of the laws.

GUARDIAN AND WARD (2)—ALIENS (3)—DISABILITIES—INTEREST OR BENEFIT IN LANDS—GUARDIANSHIP OF ESTATE. Under the alien land act, Rem. Comp. Stat., § 10581 et seq., prohibiting aliens from "owning" lands or having "the right to any benefit thereunder," an alien cannot be appointed the guardian for minors having the legal title to land; Id., § 1575, making it the duty of guardians to manage the estate for the best interest of the ward.

CONSTITUTIONAL LAW (101, 104)—EQUAL PROTECTION OF LAWS—DISCRIMINATION—ALIENS—QUALIFICATIONS AS GUARDIAN OF MINOR—STATUTES—VALIDITY. Section 3 of the alien land act (Rem. Comp. Stat., § 10583) providing that an alien is not qualified to be the guardian if any part of the estate is land, does not deny to minors whose parents are aliens the equal protection of the laws.

Appeal from an order of the superior court for King county, Dykeman, J., entered July 20, 1923, denying a petition for the appointment of an alien as guardian of the estate of a minor, after a hearing to the court. Affirmed.

*Guie & Halverstadt,* for appellants.

*The Attorney General, E. W. Anderson, Assistant, Malcolm Douglas,* and *Ewing D. Colvin,* for respondent.

MACKINTOSH, J.—Chapter 50, Laws of 1921, p. 156, provides, in § 1, that "land" includes every "interest therein and the right to the control, possession, use,

[1]Reported in 226 Pac. 505.

enjoyment, rents, issues or profits thereof,'' and to ''own'' means ''to have the legal or equitable title to or *the right to any benefit thereunder.''*  Section 2, Laws of 1921, p. 157, provides ''any alien shall not own land or take or hold title thereto and no person shall take or hold land or title to land for an alien. . . .'' Section 3, Laws of 1921, p. 157, provides that an alien ''is not qualified to be . . . guardian, if any part of the estate is land.''  [Rem. Comp. Stat., §§ 10581, 10582, 10583.]

The petition states that the Fujimotos, husband and wife, are residents of King county and subjects of the Emperor of Japan; that Frank T. Fujimoto is their son, born in Seattle, King county, in September, 1913, and during his entire life has lived with the Fujimotos, the petitioners; that in 1915, Frank T. Fujimoto, by deed, received title to real estate in King county, Washington, and is now the owner thereof; that this property needs the care and attention of a guardian; that the minor has no such guardian, and alleges that the father, one of the petitioners, is in all respects a fit and suitable person to be appointed guardian of such minor and asks for such appointment. Upon a hearing on the petition, it was denied on the ground that the father is a subject of the Emperor of Japan and therefore disqualified under ch. 50, Laws of 1921, p. 156, though in other respects he is found to be a fit and suitable person to be guardian of the person and estate of his minor son. From this order the petitioners have appealed, alleging that ch. 50, Laws of 1921, is unconstitutional in so far as it prohibits the appointment of an alien as guardian of his American-born child's estate when any part of that estate is real; in that it violates § 12, art. 1, of the state constitution and the fourteenth amendment of the Federal constitution by

denying to the child and to the father the equal protection of the law.

Upon the general question of the constitutionality of the so-called alien land law, as it may be affected by the constitutional provisions referred to, the supreme court of the United States has already passed, and that in thoroughly considered opinions.

In the case of *Terrace v. Thompson,* 263 U. S. 197, chapter 50 of the Laws of 1921, p. 156, the Washington act, was under consideration in the supreme court, and it was there held that the legislation was valid and that a citizen has no constitutional right to lease his land to aliens, and that aliens could lawfully be forbidden to take and hold such land.

In the case of *Porterfield v. Webb,* 263 U. S. 225, the supreme court of the United States came to a similar conclusion in considering some aspects of the California alien land law almost identical with the Washington act.

In *Webb v. O'Brien,* 263 U. S. 313, the supreme court of the United States, again having before it the California act, held that a contract permitting an ineligible alien to live upon and work land for a share in the crops gave him a right to use and share in the profits of the land in violation of the statutory prohibition against the acquisition of any interest in real estate.

In the case of *Frick v. Webb,* 263 U. S. 326, it was held that, under the California act, an alien ineligible to citizenship could not acquire stock in corporations which held land for agricultural purposes. So it may be taken as settled that such aliens as are covered by ch. 50, Laws of 1921, p. 156, may not take or rent or hold any title to land.

The question first arises then whether a guardian

has any such interest as is covered by the term "own." As we have already indicated, the statute includes in the definition of "own" "to have the right to any benefit of." This court, in *State v. O'Connell*, 121 Wash. 542, 209 Pac. 865, considering a trust agreement under which an alien had neither the legal nor equitable title nor the right to the control, possession or use of the real property, held that nevertheless an alien having the "right to the benefit of the property," the agreement was illegal, the court saying:

"For the purposes of this discussion, it may be conceded that, under the declaration of trust involved here, the alien does not have the right to the control, possession and use of the lands involved, and that he does not own the legal or equitable title; but that he owns the 'right to the benefit of' the land, and has the 'right to' the 'enjoyments, rents, issues and profits thereof,' there cannot be any doubt. These rights are by the legislature defined to be land or an interest in or benefit of land, and they are most surely in violation, not only of the spirit of our legislative act, but the very words thereof."

While it is true that the guardian has no legal or equitable title, it does not necessarily follow that he does not have the right to any benefit arising from the land. Under § 1575, Rem. Comp. Stat. [P. C. § 9907], it is provided that it shall be the duty of the guardian "(2) To manage the estate for the best interest of his ward," and the law, of course, provides for compensation to the guardian from the estate of his ward. It is plausibly argued that the guardian can do nothing in regard to the ward's land antagonistic to the ward's interest, or to in any way handle the estate so as to inure to his interest as opposed to that of the ward, and that in his conduct as guardian he is at all times

an officer of the court and that his acts are in effect the acts of the court. Theoretically, this argument is sound, but we know that, as a practical matter, the guardian is virtually a free agent so long as he is guilty of no acts detrimental to his ward; that in handling the estate he exercises his own judgment, and in his control of the real property, except in so far as its title may be concerned, he operates as freely as though the property were his own. The control exercised by the court is largely theoretical, in actual practice the court knows very little concerning the guardian's acts; it is usually not informed except by reports which appear when requests are made to dispose of the property by sale. With the great amount of business coming before the probate courts this is the natural result. The purpose of the alien land acts is, as has been stated by the courts, to prevent the land of the state passing into the ownership or possession or control of noncitizens, in the interest of the welfare of the state, and it would be an evasion of that clear intent and policy to allow the actual control of land to pass into the hands of aliens through the means of guardianship, although in theory the guardian is not capable of assuming control. The interest which a guardian really could have is but a degree less than that which he would acquire under a contract such as was passed on in *Webb v. O'Brien, supra,* or by reason of the ownership of stock in a corporation owning real estate, which was forbidden in *Frick v. Webb, supra,* or the interest which the alien had under a trust agreement such as was declared inoperative in *State v. O'Connell, supra.* It is often easier to sense the effect of certain relationships than to clearly express them, and where common sense indicates that to allow alien guardians to be appointed for citizen wards owning real estate is to

confer upon them certain rights to the benefit in such real estate, it is a more satisfactory guide than the mere precisions of technical legal adroitness.

In any event, the provision of § 3, ch. 50, Laws of 1921, p. 157, has a direct relation to the general purpose of the entire act, which is, as we have said, to prevent there developing in the community a large body of land under the control of persons not attached to nor obligated by our form of government. As was said in the *Frick* case, *supra,*

"The state has power, and the act evidences its purpose, to deny to ineligible aliens permission to own, lease, use or have the benefit of lands within its borders for agricultural purposes. *Webb v. O'Brien, supra,* 'As the state has the power . . . to prohibit, it may adopt such measures as are reasonably appropriate or needful to render exercise of that power effective' (citing cases). It may forbid indirect as well as direct ownership and control of agricultural land by ineligible aliens."

It would seem, therefore, that the act in question is not violative of any of the rights of the petitioners, and there only remains the question whether the act is unconstitutional as discriminating against native born minors whose parents are ineligible aliens.

There exists the natural law that minors are entitled to the guidance and care of their parents, no matter what the nationality of the latter may be, and the statute law recognizes the rights of minors to such guidance from such sources and provides for their guardianship. But the law also provides that certain classes of people, although parents, are disqualified from acting as guardians. No minor, whether his parent be alien or native, has a right to have such parent appointed guardian if the parent be disqualified by mental incapacity, conviction of crime or moral

delinquency or physical disability as to prevent his properly discharging the duties of a guardian. The act of 1921 adds another disqualification in the general interest of society, forbidding the control of land by aliens and says that no alien shall act as guardian of the estate which consists of land. This act has the same effect on all minors and prevents the appointment of such alien as guardian for the minor, whether the minor be native born or foreign, and whether the guardian be the parent of the minor or not, and it may prevent, in some instances, certain minors from having as guardian the one who would be most interested in the protection of the minor's estate. But this situation arises just as readily with native born minors having native parents but desiring to have an alien to whom he may not be related appointed guardian, either because of affectionate regard between them or because the alien may have been possessed of extraordinary qualifications which would inure greatly to the ward's benefit if the alien were permitted to manage his affairs. The right which a minor has to have an alien appointed guardian is no greater than the right a parent has to be appointed guardian, and the law having the right to say that certain persons are disqualified as guardians, the minor cannot be heard to say that he has a right to have an alien parent appointed guardian. The matter of guardianship is a proper subject of legislative action and the legislature has the power to say that certain persons or classes of persons are disqualified, as long as the law is uniform and not discriminatory. As was said in *In re Tetsubumi Yano's Estate,* 188 Cal. 645, 206 Pac. 995:

"The rights and privileges which it declares the Japanese citizen shall enjoy here are such rights and

privileges only as may be necessary for the protection and security of his own person or property. It cannot be said that it is necessary for the security or protection of either the person or the property of a parent that he should become the guardian of his own child. Eligibility to appointment as guardian is not property, nor is it a right of property. It pertains exclusively to the person. It may be given or withheld by the law of the state in which the parent and child reside. The withholding thereof from all parents would be within the power of the state.''

The act under consideration is not discriminatory, for it applies alike to all minors, no matter what governments they may be subjects of, and applies equally to the person attempting to be guardian, whether he be the parent of a minor or an alien.

It is to be remembered that the dire consequences pointed out as a result of failure of the native born minor to be allowed to have the guiding hand of his alien parent lead him through the mazes of minority are merely argumentative pictures, for our statutes provide for two sorts of guardians; one of the person and the other of the property of the minor, and as we read § 3, ch. 50, Laws of 1921, p. 157, *supra,* it relates only to guardianship of the property of the minor. If this is true the native born child of alien parents can have all the benefit of that alien as his guide, philosopher and friend generally and only prevents his turning his real property over to that guardian, which could in a great many instances result in an evasion of what the state legislature has determined to be a beneficent policy.

The supreme court of California in *In re Tetsubumi Yano's Estate, supra,* considered the question of the appointment of an alien as guardian of his American born child, where part of the child's estate was land,

and there arrived at a conclusion contrary to that which we have reached, largely basing its opinion upon the theory that the appointment of alien guardians does not permit evasion of the law forbidding aliens ineligible to citizenship to own agricultural land, the court saying:

"The appointment as guardian would not enable such parents to acquire, possess, or enjoy agricultural land, and therefore their ineligibility to such appointment could not prevent their so doing. A guardian neither acquires, possesses, or enjoys the property belonging to the ward, in any accurate or legal meaning of these terms. At most, he merely has, for some purposes, the control of the property, but the control is not in his own right and does not inure to his benefit. He controls it as trustee only, and is held to strict accountability to the child, for all the benefits accruing from the use of it. He must render such accounts annually, or oftener, if required by the court. . . . He must hold all the receipts from the farming operations as the property of the native-born child, and must use so much of it for the support and education of the child as may be necessary, and no more, and must safely invest the remainder as the property of the child and for its sole use and benefit. In all of his acts as guardian he is under the supervision and control of the superior court of the county. His compensation is limited to the reasonable value of his services, and is to be fixed by that court. The use is in the child, not in the guardian. When the child becomes of age the control of the guardian immediately ceases. If the child should die, the control would pass forthwith to its heirs, and the alien parent, in that event, would not even inherit the property or any part thereof. It seems plain that, since the alien parent could not by this means evade the operation of the law, nor acquire, possess, or enjoy agricultural land, the law cannot be upheld on the ground that such persons constitute a class, and the only class, who attempt to evade the law forbidding alien ownership. They could not, by the

use of such guardianship, enjoy the rights of owner-ship. The classification is therefore clearly arbitrary, and does not 'suggest a reason which might rationally be held to justify' the peculiar legislation addressed to the class, . . .''

We think the California court was wrong in taking the purely academic view of the situation and blinding itself to the practical operations. It takes no imagination and only a limited understanding of the real situation to know that, whatever judges may say upon the subject, a very large nullification of the alien land law would occur where the native born progeny of the fecund aliens are permitted to have alien parents as guardians of their real estate.

The trial court was correct in denying the petition and the judgment is affirmed.

MAIN, C. J., HOLCOMB, PARKER, and TOLMAN, JJ., concur.