TERRACE ET AL. v. THOMPSON, ATTORNEY GENERAL OF THE STATE OF WASHINGTON.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF WASHINGTON.

No. 29. Argued April 23, 24, 1923.—Decided November 12, 1923.

1. A Washington statute (c. 50, Laws 1921,) disqualifies aliens who have not in good faith declared intention to become citizens of the United States from taking or holding interests in land in the State for farming or other purposes not excepted, and provides that upon the making of such prohibited conveyance the land shall be forfeited to the State and the grantors be subject to criminal punishment, and the alien also, if he fail to disclose the nature and extent of his interest. Citizens owning land in Washington and an alien Japanese, desirous of consummating a lease to the alien for farming, sued to enjoin the state attorney general from taking criminal and forfeiture proceedings, as he threatened

if the lease were made, alleging that the restriction violated the federal and state constitutions and conflicted with a treaty with Japan. *Held,* that the suit was within the equity jurisdiction of the District Court. P. 214.

2. State legislation withholding the right to own land in the State from aliens who have not in good faith declared their intention to become citizens of the United States, does not transgress the due process or equal protection clauses of the Fourteenth Amendment as applied to those aliens who, under the naturalization laws of Congress, are ineligible to citizenship, or as applied to citizens who desire to lease their land to such aliens. P. 216. *Truax* v. *Raich,* 239 U. S. 33, distinguished.

3. The treaty between the United States and Japan of February 21, 1911, 37 Stat. 1504, in granting liberty to the citizens and subjects of each party " to enter, travel and reside in the territories of the other, to carry on trade, . . . to own or lease and occupy houses, manufactories, warehouses and shops, . . . to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects," does not include the right to own, lease, or have any title to or interest in land for agricultural purposes, and the Washington statute above cited is not in conflict with it. P. 222.

4. As determined by the Supreme Court of the State, the Washington statute above cited is not in conflict with § 33, Art. II, of the state constitution. P. 224.

274 Fed. 841, affirmed.

APPEAL from a decree of the District Court dismissing a bill brought by the appellants to enjoin the attorney general of Washington from enforcing the state Alien Land Law.

Mr. *James B. Howe,* with whom Mr. *E. H. Guie* and Mr. *Dallas V. Halverstadt* were on the briefs, for appellants.

I. The case is within the equity jurisdiction. *Ex parte Young,* 209 U. S. 123; *Raich* v. *Truax,* 219 Fed. 273; *Truax* v. *Raich,* 239 U. S. 33; *Buchanan* v. *Warley,* 245 U. S. 60.

II. The state constitutional provision defines all disabilities of aliens respecting lands, and the legislature had no power to add thereto.

III. The act takes the property of the parties without due process of law, in that it prohibits the alien from following a common occupation of the community, and makes it a criminal offense for the landowners to avail themselves of his services in any capacity other than of a mere wage earner, and prohibits them from making a lawful use of their property. *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746; *Barbier* v. *Connolly* 113 U. S. 27; *Powell* v. *Pennsylvania,* 127 U. S. 678; *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Coppage* v. *Kansas,* 236 U. S. 1; *Truax* v. *Raich,* 239 U. S. 33; *Adams* v. *Tanner,* 244 U. S. 590.

If a citizen desires to employ an alien as superintendent of his agricultural operations, and the alien is willing to perform these duties, such a contract cannot be prohibited by the legislature. The compensation to be paid for such services is a matter of contract between the parties; it might be fixed at a percentage of the receipts resulting from such operation. It is equally clear that a citizen landowner, absenting himself from the scene of his agricultural operations, may lawfully contract with an alien to carry on the operations in the name of the landowner and for his use, and to account for the money received; and that the compensation of the alien may be a stipulated sum or a percentage of the receipts, as the parties agree. Now, suppose the landowner to enter into a contract by which the alien agrees to farm the land and pay the landowner a stipulated sum as his share of the profits. Can it be said that the alien is any the less engaged in working as a farm hand than he would be in any of the preceding illustrations? If it be suggested that in the last case an estate in land is created, the obvious answer is that the Supreme Court of the State, in *Tibbals* v.

*Iffland,* 10 Wash. 451, has held that a lease does not create an estate in land. The further obvious answer is that to create a legal distinction between the two acts is to relegate substance to form, contrary to all of the decisions of this Court on constitutional questions. See *Tieton Hotel Co.* v. *Manheim,* 75 Wash. 641; *O'Brien* v. *Webb,* 279 Fed. 117.

The prohibition of the act is contrary to the due process clause of the Fourteenth Amendment, because it is, is effect, a prohibition of the right of an alien to engage in one of the common occupations of life. The applicability of the due process clause to the right of the citizen landowner is no less clear. The Terraces acquired this property prior to the passage of the act, at a time when it might lawfully be leased to a Japanese, but the act now prohibits this by severe penalties. Their right to use their property in a lawful way, and enjoy its fruits, has been proscribed.

Each of the parties may urge the invalidity of the act from the viewpoint of the other. *New York Central R. R. Co.* v. *White,* 243 U. S. 188; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Truax* v. *Raich,* 239 U. S. 33; *Buchanan* v. *Warley,* 245 U. S. 60.

IV. The act violates the equal protection clause of the Fourteenth Amendment, in that it makes a classification which bears no reasonable relation to a legitimate legislative end. *Buchanan* v. *Warley,* 245 U. S. 60.

The act divides aliens into two classes, namely, those who may, and those who may not, become citizens of the United States, extending to the former all rights of citizens with respect to real estate, upon the filing of a declaration of intention, while barring the latter class absolutely, because none of them can at any time in good faith file a declaration of intention. Excepting rights of the State (1) to prohibit the ownership of lands within its border, there being no treaty to the contrary, *Chirac* v. *Chirac,* 2 Wheat.

259; *Hauenstein* v. *Lynham,* 100 U. S. 483; *DeVaughn* v. *Hutchinson,* 165 U. S. 565; *Clarke* v. *Clarke,* 178 U. S. 186; *Blythe* v. *Hinckley,* 180 U. S. 333; (2) to limit the right to take the common property of the State, such as game and fish, to citizens of the State, *McCready* v. *Virginia,* 94 U. S. 391; *Patsone* v. *Pennsylvania,* 232 U. S. 138; (3) to employ none but citizens on public work, *Atkin* v. *Kansas,* 191 U. S. 207; *Heim* v. *McCall,* 239 U. S. 175; and (4) to limit the right of the franchise to citizens of the State, *Yick Wo* v. *Hopkins,* 118 U. S. 356; aliens are within the equal protection clause as fully as citizens. *Ex parte Virginia,* 100 U. S. 339; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Fong Yue Ting* v. *United States,* 149 U. S. 698; *Wong Wing* v. *United States,* 163 U. S. 228; *United States* v. *Wong Kim Ark,* 169 U. S. 649; *American Sugar Refg. Co.* v. *Louisiana,* 179 U. S. 89; *Truax* v. *Raich,* 239 U. S. 33; *Buchanan* v. *Warley,* 245 U. S. 60; *Re Tiburcio Parrott,* 1 Fed. 481; *Ho Ah Kow* v. *Nunan,* 5 Sawy. 552; *Re Ah Fong,* 3 Sawy. 144; *State* v. *Montgomery,* 94 Me. 192; *Templar* v. *Board,* 131 Mich. 254; *Opinion of Justices,* 207 Mass. 601; *Commonwealth* v. *Titcomb,* 229 Mass. 14.

The legislature being powerless to discriminate against aliens in favor of citizens and to classify upon the ground of alienage, how can it in reason be said that it may nevertheless discriminate against some aliens in favor of others, or classify aliens among themselves?

It is, of course, true that Congress may permit all aliens, or any class of aliens, less than all, to be naturalized, for whatever reason may seem to it sufficient or wise, being bound by no constitutional limitation on the subject. *United States* v. *Wong Kim Ark,* 169 U. S. 649. But it must be remembered that, in the matter of admitting aliens to naturalization, Congress was dealing with a political subject, and not a property right. The act in question deals not with political rights, but with property

rights, because, at common law, and in the State of Washington, prior to the enactment in question, aliens had the absolute right to lease real estate for a reasonable term, that is, a term sufficiently short to have no incident whatever of ownership, direct or indirect. 1 R. C. L. p. 823, § 33; *Winston* v. *Morrison,* 18 Wash. 664. In view of this, it is apparent that the act of Congress cannot be used as the basis of the classification attempted in the act of the State.

Game and fish are the property of the State, within the plenary power of the legislature, and their taking may be prohibited to all persons who are not citizens of the State, yet, in *Re Ah Chong,* 6 Sawy. 45, a statute of California prohibiting all aliens incapable of becoming electors of the State from fishing in the waters of the State, was held violative of the equal protection clause and the treaty with China. This case was cited with approval in *San Mateo* v. *Southern Pacific Ry. Co.,* 15 Fed. 722; *United States* v. *Balsara,* 180 Fed. 694; *Re Takai Maru,* 190 Fed. 45; *Raich* v. *Truax,* 219 Fed. 273; *Tragesser* v. *Gray,* 73 Md. 251; *Commonwealth* v. *Cosick,* 36 Pa. Co. Ct. Rep. 637; *Harper* v. *Galloway,* 58 Fla. 255. Contra: *Commonwealth* v. *Hanna,* 195 Mass. 262. See also *State* v. *Savage,* 96 Ore. 53; *Poon* v. *Miller,* 234 S. W. 573; *Estate of Yano,* 188 Cal. 645.

If every foot of land within the State of Washington should pass into the ownership or possession of aliens, as imagined by the court below, then little could be said in defense of the act as an expression of representative government. But the assumptions which are permissible to the legislature, when enacting a rule of conduct, do not include such a theoretical possibility. Again, the act of government forcing on a resident within its jurisdiction a condition which causes him to lack an interest in and power effectually to work for the welfare of the State, and then classifying him on the ground of the necessary

result of that condition, does not square with the doctrine of American fair play. The statement of the lower court that a difference, however arbitrary, might be availed of as a ground, of classification by a State, bound by the equal protection clause of the Fourteenth Amendment, is directly contrary to the decisions of this Court.

The only legitimate end to be accomplished by the act in question is insuring that the rights in or to real estate, mentioned in the act, shall be exercised only by those persons who adhere and are attached to, and respect, our government and its institutions. Aliens of the proscribed class, resident in the State, may fulfill this requirement as completely as the most patriotic citizen in the State, but they are nevertheless proscribed by the act. No means are afforded by which the ultimate fact, which is the legitimate end of such legislation, can be determined, and the question is forever foreclosed by the statute, irrespective of the fact. See *Smith* v. *Texas*, 233 U. S. 630.

It cannot be said that the subjects of Russia and Turkey are attached to or respect the American Government or its institutions; or that the admission to citizenship of the Zulu, the Kaffir, the cannibals of the Congo and the tribes of Ashantee and Dahomey, contribute to the success and preservation of our government and civilization. China has been a republic for some years and has been recognized as such by our government, but the Chinese cannot be admitted to citizenship, and hence are denied the right of other aliens to lands in the State of Washington. Japan stands among the foremost nations today, not only in civilization, accomplishment, civic pride, but in all those national attributes which make her one of the great recognized powers. Her nationals, resident in America, are notably law-abiding and industrious, and actuated by civic pride which well might be emulated by American citizens. Many of them have been residents of the State for years, have made it their permanent homes.

When an act, which concededly must have a substantial relation to the determination of the existence or absence of adherence and attachment to and respect for American institutions and the American Government, so utterly fails to accomplish that purpose, how can it be said that it is other than an arbitrary fiat formulated in utter disregard of the facts?

 The vice of this act is that it makes a class within a class. *State* v. *Julow,* 129 Mo. 163; *Connolly* v.. *Union Sewer Pipe Co.,* 184 U. S. 540; *Gulf, Colorado & S. F. Ry. Co.* v. *Ellis;* 165 U. S. 150; *Cotting* v. *Kansas City Stock Yards Co.,* 183 U. S. 79; *McFarland* v. *American Sugar Refg. Co.,* 241 U. S. 79. A valid classification must have a reasonable relation to a legitimate end of government, and a classification which has no tendency to the accomplishment of that purpose is void.

White men, black men, red men, and brown men are very different, and there is a vast difference between a man of wealth and a poverty-stricken man, but a rule of conduct based upon such differences would be clearly invalid. *Gulf, Colorado & S. F. Ry. Co.* v. *Ellis,* 165 U. S. 150; *Tanner* v. *Little,* 240 U. S. 369; *Constantini* v. *Darwin,* 102 Wash. 402.

V. The impossibility of compliance with the act by a Japanese frees him from the obligation to comply. Endlich, Interpretation of Statutes, § 441; Bishop, Non-contract Law, § 156; Bishop, Contracts, § 595.

VI.. The act is contrary to Art. I of the existing treaty between the United States and Japan, in that it prohibits Japanese subjects, resident in the State, from carrying on therein trade, from leasing land for commercial purposes and from doing the things necessary or incident to trade upon the same terms as native citizens or subjects. The treaty should be interpreted frankly and liberally to avoid invidious distinctions.

This alien being engaged in wholesale and retail trade in farm products, producing the farm products is a com-

mercial purpose and is incident to or necessary for trade therein.   As to the meaning of the term "trade", see *Schooner Nymph,* 1 Sumn. 517; *May* v. *Sloan,* 101 U. S. 231; *Colby* v. *Dean,* 70 N. H. 591; *Jackson* v. *Town of Union,* 82 Conn. 266; *State* v. *North,* 160 N. C. 1010; *Smith* v. *Cooley,* 65 Cal. 46; *Finnegan* v. *Knights of Labor Bldg. Assn.,* 52 Minn. 239.   These authorities show that the term "trade" is not always given a narrow meaning, but that its meaning is determined according to the apparent intention of the parties to the instrument in which it is used.

*Mr. L. L. Thompson,* Attorney General of the State of Washington, with whom *Mr. E. W. Anderson* was on the brief, for appellee.

I. It is submitted that there is no jurisdiction in equity; under *Boise Water Co.* v. *Boise City,* 213 U. S. 276; *Singer Sewing Machine Co.* v. *Benedict,* 229 U. S. 481; *Dalton Adding Machine Co.* v. *Virginia,* 236 U. S. 699; *Cavanaugh* v. *Looney,* 248 U. S. 453.   Neither can the jurisdiction be sustained on account of the severity of the penalty, under *Ex parte Young,* 209 U. S. 123.   See *Tanner* v. *Little,* 240 U. S. 369.

II. Power to prohibit leases of this character was not denied by the state constitution.   This Court is bound to accept the construction of that constitution adopted by the highest court of that State.

III. The argument that the transaction in question cannot be prohibited, under the Fourteenth Amendment assumes that the case is to be determined entirely by the general rules which obtain in ordinary police power cases. Even though that assumption be accepted the legislative action under consideration is sustainable.

The argument fails to distinguish between the particular thing here involved and the average occupation in which an alien might desire to engage; and is based

upon too broad a conception of the scope of the due process clause with reference to aliens, as applied in *Truax* v. *Raich,* 239 U. S. 33.

The validity of the particular restriction now before the Court, if the act be considered as an ordinary police measure, depends upon its relation to the public welfare, and is not determined by any announced conclusions of this Court with respect to the rights of aliens to follow other and different occupations. Concretely, the question is whether the Court can say that the public welfare could not be injuriously affected by the leasing of real property to persons who owe to the State and Nation no obligations of allegiance.

While the common law cannot justify the denial of a constitutional right, the fact that both the common law and the statute are in accord affords a cognate reason why the statute should be sustained. The public policy of prohibiting the alien ownership of real property, except in very limited cases, has been an outstanding principle of the common law almost since its inception. Coke Upon Littleton, Bk. 1–2b; 1 Black. Com. 372; 2 Kent. Com., 14th ed., 53–64; Kerr, Real Property, 215 et seq.; Tiffany, Real Property, 2350; 1 Stimson's Am. St. Law, 6013; 1 Stephens, Com. on Law of England, 330–376; Sedgewick, Trial of Title, 226; 1 Washburn, Real Property, 131; *Halter* v. *Nebraska,* 205 U. S. 34; *Purity Extract Co.* v. *Lynch,* 226 U. S. 192; *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389; *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157; *Noble State Bank* v. *Haskell,* 219 U. S. 104; *Jacobson* v. *Massachusetts,* 197 U. S. 11. The application of this rule to the question of the desirability of allowing aliens to possess dominion over the soil, will show that the preponderant public opinion of the country has always been opposed to this, and that this opinion has been particularly intensified in recent years. [Citing Wheaton, Int. Law, 5th ed., p. 138, note, and numerous

state statutes.]   Congress has always limited the right
to appropriate the unoccupied public domain to citizens
or to persons who have filed declarations of intention to
become such.   Rev. Stats., § 2289.   See also the acts
respecting ownership of land in the Territories, and
especially in Hawaii.   29 Stat. 618; 31 Stat. 154.   It
appears that aliens are not permitted to own real property
in Japan.   DeBecker's Annotated Civil Code of Japan,
vol. 1, pp. 7, 238, 242.

This course of legislation indicates a uniform popular
view that the public welfare is directly affected by the
alien ownership of realty.   It is particularly noteworthy
that the most drastic action in this regard has been taken
by those States in which there are found large bodies of
aliens who are not permitted by Congress to become
naturalized.   Presumably, this legislation is the result of
experience and of a more intimate knowledge of local
conditions than the Court can obtain by the exercise of
its judicial knowledge.   *Fallbrook Irrigation District* v.
*Bradley,* 164 U. S. 112, 160.

This Court has consistently recognized the power of the
States with respect to the ownership of land by aliens.
*Fairfax's Devisee* v. *Hunter's Lessee,* 7 Cr. 603; *Chirac* v.
*Chirac,* 2 Wheat. 259; *Orr* v. *Hodgson,* 4 Wheat. 453;
*Hauenstein* v. *Lynham,* 100 U. S. 483; *Atlantic & Pacific
R. R. Co.* v. *Mingus,* 165 U. S. 413; *Taylor* v. *Benham,* 5
How. 233; *United States* v. *Repentigny,* 5 Wall. 211;
*Blythe* v. *Hinckley,* 180 U. S. 333; *Truax* v. *Raich,* 239
U. S. 33; *Geofroy* v. *Riggs,* 133 U. S. 258; *Donaldson* v.
*State,* 182 Ind. 615; 22 R. C. L. 83; 2 C. J. 1048; *Jones*
v. *Jones,* 234 U. S. 615.   The common law rule was in
accord with the law of nations as recognized by all civi-
lized countries.   Wheaton, Int. Law, 5th ed., 132; Foelix,
Droit International Privé, § 9; Vattel, Law of Nations
(Chitty's ed.) p. 177; Coke Upon Littleton, Bk. 1–2b;
1 Black. Com. (Cooley's ed.) p. 669.   If the power to pro-

hibit the holding of the fee simple title by an alien rests in the police power, then the same rule would, of course, apply to leases. The prosperity of the State must rest in large measure upon obligations incident to citizenship and national allegiance. The possession of the soil by persons who recognize no such obligations but who are bound only by specific statutory mandates thus has a direct relation to the public welfare. The importance of this is more marked in a nation whose governmental power is restricted by constitutional limitations than in an autocratic community. The fact that there is no relation between the employment of aliens in ordinary transitory occupations and the public welfare by no means compels the same conclusion where there is involved sovereignty over the soil, a thing upon which our political existence may well depend. The contention that because the situations have a surface similarity and that therefore the Fourteenth Amendment operates in the same degree in both instances, is simply another one of the oft-repeated attempts to define and limit the police power by specific definition and limitation. This Court has always consistently refused to do this. *Munn* v. *Illinois*, 94 U. S. 113. The police power is not restricted to emergency regulations, such as health measures, but extends to measures designed to subserve the public welfare and prosperity. *Barbier* v. *Connolly*, 113 U. S. 27; *Chicago, Burlington & Quincy Ry. Co.* v. *Illinois*, 200 U. S. 561; *Central Lumber Co.* v. *South Dakota*, 226 U. S. 157. The ownership of large parcels of realty by aliens may be dangerous to the public welfare of a State for many possible reasons. Unless the Court can see that the reasons for the law are illusory, the legislative action must be sustained.

It will probably be said in response to this that some of these reasons, such as the economic competition of foreign labor, might have been urged in support of the act

declared invalid in *Truax* v. *Raich*, 239 U. S. 33. We think that possibility would not dispose of the question. Once within our borders, an alien cannot be deprived of the right to live, and to live must labor or be supported by the charity of others. An interference with that right under the police power is, therefore, subject to certain limitations, the exact nature of which need not be specifically designated. The Arizona statute applied to all occupations, irrespective of their nature. The practical effect, as pointed out in the opinion, was to exclude aliens from the State,—a subject entrusted to Congress.

In the field of agriculture the American and Oriental cannot compete. The possible result of such a condition would be that in the course of time, in certain sections of the country, at least, all lands might pass to these classes of aliens. The people of the State would then be entirely dependent for their very existence upon alien races who recognize to the State or Nation no other obligations than those forcibly imposed.

Whether, under the laws of Washington, a lease creates an interest in real estate, is not material. It can make no differen e whether a lease be viewed as an interest in realty or as personal property. But leases have always been regarded in Washington as conveying an interest in land.

This, however, is not an ordinary police power case. The power exercised is broader than exists over the right of a citizen to follow the ordinary pursuits of life; it need not be justified by concrete instances of apprehended dangers, but should simply be recognized as one of the necessary incidents of governmental existence. Every writer on the law of nations and all civilized countries have recognized its existence since the beginning of history. It is a part of the sovereignty of a State, and of a kind, we submit, never intended to be taken away by the Fourteenth Amendment.

74308°—24——14

IV. Equal protection of the laws. The mere statement of the cause for the exercise of the power in this instance would seem to prevent any question of classification from arising, because the statute includes the entire field which occasioned the exercise of the power. The justification for the act under the police power does not rest upon the racial characteristics, or upon the idea that the excluded classes may not be law abiding and industrious. The regulation is occasioned by the legislative view that persons who are not at least morally bound by obligations of citizenship should not be permitted to obtain control of a thing so vital to the political existence of a State as is the land. The question of whether certain persons should be permitted to assume those obligations is entirely legislative, and consequently immaterial here. It is sufficient that Congress has refused to extend those privileges to certain races. It can make no difference whether their refusal to recognize those obligations is occasioned by deficiencies in their character or by an act of Congress. The result is the same in either case in so far as the public welfare of the State is concerned; that is to say, a thing upon which the State depends for its existence passes into the hands of persons who recognize no voluntary obligations to it.

The police power of the State extends to all subjects which affect the public welfare and the alleged fact that, if the National Government had acted differently, the occasion for the exercise of the power would not have arisen, is of no relevancy. This factor marks the distinction between the case of *Truax* v. *Raich, supra; Yick Wo* v. *Hopkins,* 118 U. S. 356, and various decisions of state and lower federal courts holding invalid, attempts to deprive aliens of the right to engage in various occupations and the case at bar.

Declarants in good faith are included in the same class as citizens, because they have taken the preliminary steps

looking to citizenship and presumably will, in due course, attain that citizenship. The fact that, to a greater or less extent, the same danger may be common to two classes of persons would not for that reason render a regulation directed at one class only, void. *Patsone* v. *Pennsylvania,* 232 U. S. 138; *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157; *Miller* v. *Wilson,* 236 U. S. 373; *Keokee Coke Co.* v. *Taylor,* 234 U. S. 224; *International Harvester Co.* v. *Missouri,* 234 U. S. 199. There is an obvious difference between the service to the State to be expected from a person who has been permitted in a formal way to declare his intention to abandon his allegiance to another nation, and one who has not taken that step.

V. The act is not in conflict with the treaty.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Appellants brought this suit to enjoin the Attorney General of Washington from enforcing the Anti-Alien Land Law of that State, c. 50, Laws, 1921, on the grounds that it is in conflict with the due process and equal protection clauses of the Fourteenth Amendment; with the treaty between the United States and Japan, and with certain provisions of the constitution of the State.

The appellants are residents of Washington. The Terraces are citizens of the United States and of Washington. Nakatsuka was born in Japan of Japanese parents and is a subject of the Emperor of Japan. The Terraces are the owners of a tract of land in King County which is particularly adapted to raising vegetables, and which for a number of years had been devoted to that and other agricultural purposes. The complaint alleges that Nakatsuka is a capable farmer and will be a desirable tenant of the land; that the Terraces desire to lease their land to him for the period of five years; that he desires to accept such lease, and that the lease would be made but

for the act complained of.  And it is alleged that the defendant, as Attorney ˙General, has threatened to and . will take steps to enforce the act against the appellants if they enter into such lease, and will.treat the leasehold interest as forfeited to the State, and will prosecute the appellants criminally for violation of the act; that the act is so drastic and the penalties attached .to its violation are so great that neither of the appellants may make the lease even to test the constitutionality of the act, and that, unless the court shall determine its validity in this suit, the appellants will be compelled to submit to it, whether valid or invalid, and thereby will be deprived of their ˙property without due process of law and denied the equal protection of the laws.

The Attorney General made a motion to dismiss the amended complaint upon the ground that it did not state any matters of equity or facts sufficient to entitle the appellants · to relief.  The District Court granted the motion and entered a decree of dismissal on the merits. The case is here on appeal from that decree.

Section 33 [1] of Article. II of the Constitution of Washington prohibits the ownership of land by aliens other˙ than those who in good faith have declared intention to become citizens of the United States, except in certain

---

. [1] Section. 33. The ownership of lands by aliens, other than those who in good faith· have declared their intention to become citizens of the United States, is prohibited in this State, except where acquired by inheritance, under mortgage or in good faith in the ordinary course of justice in the collection of debts; and all conveyances of· land hereafter made to any alien directly or. in trust for such alien shall be void: Provided, That the provisions of this section shall not apply to lands containing valuable deposits of minerals, metals, iron, coal, or fire-clay, and the necessary land for mills and machinery to be used in the development thereof and the manufacture of the products therefrom.  Every corporation, the majority of the capital stock of. which is owned by aliens, shall be considered an alien for the purposes of this prohibition.

instances not here involved.   The act [2] provides in substance that any such alien shall not own, take, have or hold the legal or equitable title, or right to any benefit of any land as defined in the act, and that land conveyed to or for the use of aliens in violation of the state constitution or of the act shall thereby be forfeited to the State. And it is made a gross misdemeanor, punishable by fine or imprisonment or both, knowingly to transfer land or the right to the control, possession or use of land to such an alien.   It is also made a gross misdemeanor for any such alien having title to such land or the control, possession or use thereof, to refuse to disclose to the Attorney General or the prosecuting attorney the nature and extent of his interest in the land.   The Attorney General and the prosecuting attorneys of the several counties are charged with the enforcement of the act.

---

[2] Section 1. In this act, unless the context otherwise requires,

(a) "Alien" does not include an alien who has in good faith declared his intention to become a citizen of the United States, but does include all other aliens and all corporations and other organized groups of persons a majority of whose capital stock is owned or controlled by aliens or a majority of whose members are aliens;

(b) "Land" does not include lands containing valuable deposits of minerals, metals, iron, coal or fire-clay or the necessary land for mills and machinery to be used in the development thereof and the manufacture of the products therefrom, but does include every other kind of land and every interest therein and right to the control, possession, use, enjoyment, rents, issues or profits thereof.   .   .   .

(d) To "own" means to have the legal or equitable title to or the right to any benefit of;

(e) "Title" includes every kind of legal or equitable title;

Section 2. An alien shall not own land or take or hold title thereto. No person shall take or hold land or title to land for an alien.   Land now held by or for aliens in violation of the constitution of the state is forfeited to and declared to be the property of the state.   Land hereafter conveyed to or for the use of aliens in violation of the constitution or of this act shall thereby be forfeited to and become the property of the state.

1. The Attorney General questions the jurisdiction of the court to grant equitable relief even if the statute be unconstitutional.   He contends that the appellants have a plain, adequate and speedy remedy at law; that the case involves but a single transaction, and that, if the proposed lease is made, the only remedy which the State has, so far as civil proceedings are concerned, is an escheat proceeding in which the validity of the law complained of may be finally determined; that an acquittal of the Terraces of the criminal offense created by the statute would protect them from further prosecution, and that Nakatsuka is liable criminally only upon his failure to disclose the fact that he holds an interest in the land.

The unconstitutionality of a state law is not of itself ground for equitable relief in the courts of the United States.   That a suit in equity does not lie where there is a plain, adequate and complete remedy at law is so well understood as not to require the citation of authorities. But the legal remedy must be as complete, practical and efficient as that which equity could afford.   *Boise Artesian Water Co.* v. *Boise City*, 213 U. S. 276, 281; *Walla Walla City* v. *Walla Walla Water Co.*, 172 U. S. 1, 11, 12. Equity jurisdiction will be exercised to enjoin the threatened enforcement of a state law which contravenes the Federal Constitution wherever it is essential in order effectually to protect property rights and the rights of persons against injuries otherwise irremediable; and in such a case a person, who as an officer of the State is clothed with the duty of enforcing its laws and who threatens and is about to commence proceedings, either civil or criminal, to enforce such a law against parties affected, may be enjoined from such action by a federal court of equity.   *Cavanaugh* v. *Looney*, 248 U. S. 453, 456; *Truax* v. *Raich,* 239 U. S. 33, 37, 38.   See also *Ex parte Young*, 209 U. S. 123, 155, 162; *Adams* v. *Tanner*, 244 U. S. 590, 592; *Greene* v. *Louisville & Interurban*

*R. R. Co.,* id. 499, 506; *Home Telephone & Telegraph Co.* v. *Los Angeles,* 227 U. S. 278, 293; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 621; *Western Union Telegraph Co.* v. *Andrews,* 216 U. S. 165; *Dobbins* v. *Los Angeles,* 195 U. S. 223, 241; *Davis & Farnum Manufacturing Co.* v. *Los Angeles,* 189 U. S. 207, 217.

The Terraces' property rights in the land include the right to use, lease and dispose of it for lawful purposes (*Buchanan* v. *Warley,* 245 U. S. 60, 74), and the Constitution protects these essential attributes of property (*Holden* v. *Hardy,* 169 U. S. 366, 391), and also protects Nakatsuka in his right to earn a livelihood by following the ordinary occupations of life. *Truax* v. *Raich, supra; Meyer* v. *Nebraska,* 262 U. S. 390. If, as claimed, the state act is repugnant to the due process and equal protection clauses of the Fourteenth Amendment, then its enforcement will deprive the owners of their right to lease their land to Nakatsuka, and deprive him of his right to pursue the occupation of farmer, and the threat to enforce it constitutes a continuing unlawful restriction upon and infringement of the rights of appellants, as to which they have no remedy at law which is as practical, efficient or adequate as the remedy in equity. And assuming, as suggested by the Attorney General, that after the making of the lease the validity of the law might be determined in proceedings to declare a forfeiture of the property to the State or in criminal proceedings to punish the owners, it does not follow that they may not appeal to equity for relief. No action at law can be initiated against them until after the consummation of the proposed lease. The threatened enforcement of the law deters them. In order to obtain a remedy at law, the owners, even if they would take the risk of fine, imprisonment and loss of property, must continue to suffer deprivation of their right to dispose of or lease their land to any such alien until one is found who will join them

in violating the terms of the enactment and take the risk of forfeiture. Similarly Nakatsuka must continue to be deprived of his right to follow his occupation as farmer until a land owner is found who is willing to make a forbidden transfer of land and take the risk of punishment. The owners have an interest in the freedom of the alien, and he has an interest in their freedom, to make the lease. The state act purports to operate directly upon the consummation of the proposed transaction between them, and the threat and purpose of the Attorney General to enforce the punishments and forfeiture prescribed prevent each from dealing with the other. *Truax* v. *Raich, supra.* They are not obliged to take the risk of prosecution, fines and imprisonment and loss of property in order to secure an adjudication of their rights. The complaint presents a case in which equitable relief may be had, if the law complained of is shown to be in contravention of the Federal Constitution.

2. Is the act repugnant to the due process clause or the equal protection clause of the Fourteenth Amendment?

Appellants contend that the act contravenes the due process clause in that it prohibits the owners from making lawful disposition or use of their land, and makes it a criminal offense for them to lease it to the alien, and prohibits him from following the occupation of farmer; and they contend that it is repugnant to the equal protection clause in that aliens are divided into two classes,—those who may and those who may not become citizens, one class being permitted, while the other is forbidden, to own land as defined.

Alien inhabitants of a State, as well as all other persons within its jurisdiction, may invoke the protection of these clauses. *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369; *Truax* v. *Raich, supra,* 39. The Fourteenth Amendment, as against the arbitrary and capricious or unjustly discriminatory action of the State, protects the owners in their

right to lease and dispose of their land for lawful purposes and the alien resident in his right to earn a living by following ordinary occupations of the community, but it does not take away from the State those powers of police that were reserved at the time of the adoption of the Constitution. *Barbier* v. *Connolly,* 113 U. S. 27, 31; *Mugler* v. *Kansas,* 123 U. S. 623, 663; *Powell* v. *Pennsylvania,* 127 U. S. 678, 683; *In re Kemmler,* 136 U. S. 436, 449; *Lawton* v. *Steel,* 152 U. S. 133, 136; *Phillips* v. *Mobile,* 208 U. S. 472, 479; *Hendrick* v. *Maryland,* 235 U. S. 610, 622, 623. And in the exercise of such powers the State has wide discretion in determining its own public policy and what measures are necessary for its own protection and properly to promote the safety, peace and good order of its people.

And, while Congress has exclusive jurisdiction over immigration, naturalization and the disposal of the public domain, each State, in the absence of any treaty provision to the contrary, has power to deny to aliens the right to own land within its borders. *Hauenstein* v. *Lynham,* 100 U. S. 483, 484, 488; *Blythe* v. *Hinckley,* 180 U. S. 333, 340. Mr. Justice Field, speaking for this Court (*Phillips* v. *Moore,* 100 U. S. 208) said (p. 212):

"By the common law, an alien cannot acquire real property by operation of law, but may take it by act of the grantor, and hold it until office found; that is, until the fact of alienage is authoritatively established by a public officer, upon an inquest held at the instance of the government." [3]

---

[3] In *Fairfax's Devisee* v. *Hunter's Lessee,* 7 Cranch, 603, 609, 619, 620, it was said, per Story, J.: "It is clear by the common law, that an alien can take lands by purchase, though not by descent; or, in other words, he cannot take by the act of law, but he may by the act of the party. . . . . In the language of the ancient law, the alien has the capacity to *take,* but not to *hold* lands, and they may be seized into the hands of the sovereign." See also 1 Cooley's Blackstone (4th ed.) 315, *372; 2 Kent's Commentaries (14th ed.) 80. *54.

State legislation applying alike and equally to all aliens, withholding from them the right to own land, cannot be said to be capricious or to amount to an arbitrary deprivation of liberty or property, or to transgress the due process clause.

This brings us to a consideration of appellants' contention that the act contravenes the equal protection clause. That clause secures equal protection to all in the enjoyment of their rights under like circumstances. *In re Kemmler, supra; Giozza v. Tiernan,* 148 U. S. 657, 662. But this does not forbid every distinction in the law of a State between citizens and aliens resident therein. In *Truax v. Corrigan,* 257 U. S. 312, this Court said (p. 337):

" In adjusting legislation to the need of the people of a State, the legislature has a wide discretion and it may be fully conceded that perfect uniformity of treatment of all persons is neither practical nor desirable, that classification of persons is constantly necessary. . . Classification is the most inveterate of our reasoning processes. We can scarcely think or speak without consciously or unconsciously exercising it. It must therefore obtain in and determine legislation; but it must regard real resemblances and real differences between things, and persons, and class them in accordance with their pertinence to the purpose in hand."

The rights, privileges and duties of aliens differ widely from those of citizens; and those of alien declarants differ substantially from those of nondeclarants. Formerly in many of the States the right to vote and hold office was extended to declarants, and many important offices have been held by them. But these rights have not been granted to nondeclarants. By various acts of Congress,[4]

---

[4] Act of March 3, 1863, c. 75, 12 Stat. 731; Act of April 22, 1898, c. 187, 30 Stat. 361; Act of January 21, 1903, c. 196, 32 Stat. 775; Act of June 3, 1916, c. 134, §§ 57, 111, 39 Stat. 197; Act of May 18, 1917, c. 15, § 2; Act of July 9, 1918, c. 143; Act of August 31, 1918, c. 166, 40 Stat. 76, 884, 955.

declarants have been made liable to military duty, but no act has imposed that duty on nondeclarants. The fourth paragraph of Article I of the treaty invoked by the appellants, provides that the citizens or subjects of each shall be exempt in the territories of the other from compulsory military service either on land or sea, in the regular forces, or in the national guard, or in the militia; also from all contributions imposed in lieu of personal service, and from all forced loans or military exactions or contributions. The alien's formally declared bona fide intention to renounce forever all allegiance and fidelity to the sovereignty to which he lately has been a subject, and to become a citizen of the United States and permanently to reside therein [5] markedly distinguishes him from an ineligible alien or an eligible alien who has not so declared.

By the statute in question all aliens who have not in good faith declared intention to become citizens of the United States, as specified in § 1 (a), are called " aliens," and it is provided that they shall not " own " " land," as defined in clauses (d) and (b) of § 1 respectively. The class so created includes all, but is not limited to, aliens not eligible to become citizens. Eligible aliens who have not declared their intention to become citizens are included, and the act provides that unless declarants be admitted to citizenship within seven years after the declaration is made, bad faith will be presumed. This leaves the class permitted so to own land made up of citizens and aliens who may, and who intend to, become citizens, and who in good faith have made the declaration required by the naturalization laws. The inclusion of good faith declarants in the same class with citizens does not unjustly discriminate against aliens who are ineligible or

[5] Act of June 29, 1906, c. 3592, 34 Stat. 596, as amended, Act of June 25, 1910, c. 401, 36 Stat. 829.

against eligible aliens who have failed to declare their intention. The classification is based on eligibility and purpose to naturalize. Eligible aliens are free white persons and persons of African nativity or descent.[6] Congress is not trammeled, and it may grant or withhold the privilege of naturalization upon any grounds or without any reason, as it sees fit. But it is not to be supposed that its acts defining eligibility are arbitrary or unsupported by reasonable considerations of public policy. The State properly may assume that the considerations upon which Congress made such classification are substantial and reasonable. Generally speaking, the natives of European countries are eligible. Japanese, Chinese and Malays are not. Appellants' contention that the state act discriminates arbitrarily against Nakatsuka and other ineligible aliens because of their race and color is without foundation. All persons of whatever color or race who have not declared their intention in good faith to become citizens are prohibited from so owning agricultural lands. Two classes of aliens inevitably result from the naturalization laws,—those who may and those who may not become citizens. The rule established by Congress on this subject, in and of itself, furnishes a reasonable basis for classification in a state law withholding from aliens the privilege of land ownership as defined in the act. We agree with the court below (274 Fed. 841, 849) that:

" It is obvious that one who is not a citizen and cannot become one lacks an interest in, and the power to effectually work for the welfare of, the state, and, so lacking, the state may rightfully deny him the right to own and lease real estate within its boundaries. If one incapable of citizenship may lease or own real estate, it is within the

[6]Act of July 14, 1870, c. 254, § 7, 16 Stat. 256, as amended, Act of February 18, 1875, c. 80, 18 Stat. 318; *Ozawa* v. *United States,* 260 U. S. 178; *United States* v. *Thind,* 261 U. S. 204.

realm of possibility that every foot of land within the state might pass to the ownership or possession of noncitizens."

And we think it is clearly within the power of the State to include nondeclarant eligible aliens and ineligible aliens in the same prohibited class. Reasons supporting discrimination against aliens who may but who will not naturalize are obvious.

*Truax v. Raich, supra,* does not support the appellants' contention. In that case, the Court held to be repugnant to the Fourteenth Amendment an act of the legislature of Arizona making it a criminal offense for an employer of more than five workers at any one time, regardless of kind or class of work, or sex of workers, to employ less than eighty per cent. qualified electors or native born citizens of the United States. In the opinion it was pointed out that the legislation there in question did not relate to the devolution of real property, but that the discrimination was imposed upon the conduct of ordinary private enterprise covering the entire field of industry with the exception of enterprises that were relatively very small. It was said that the right to work for a living in the common occupations of the community is a part of the freedom which it was the purpose of the Fourteenth Amendment to secure.

In the case before us, the thing forbidden is very different. It is not an opportunity to earn a living in common occupations of the community, but it is the privilege of owning or controlling agricultural land within the State. The quality and allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the State itself.

The Terraces, who are citizens, have no right safeguarded by the Fourteenth Amendment to lease their land to aliens lawfully forbidden to take or have such lease.

The state act is not repugnant to the equal protection clause and does not contravene the Fourteenth Amendment.

3. The state act, in our opinion, is not in conflict with the treaty [7] between the United States and Japan. The preamble declares it to be " a treaty of commerce and navigation ", and indicates that it was entered into for the purpose of establishing the rules to govern commercial intercourse between the countries.

The only provision that relates to owning or leasing land is in the first paragraph of Article I, which is as follows:

" The citizens or subjects of each of the High Contracting Parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established."

For the purpose of bringing Nakatsuka within the protection of the treaty, the amended complaint alleges that, in addition to being a capable farmer, he is engaged in the business of trading, wholesale and retail, in farm products and shipping the same in intrastate, interstate and foreign commerce; and, instead of purchasing such farm products, he has produced, and desires to continue to produce, his own farm products for the purpose of selling them in such wholesale and retail trade, and if he is prevented from leasing land for the purpose of producing farm products for such trade he will be prevented from engaging in trade and the incidents to trade, as he is authorized to do under the treaty.

---

[7] 37 Stat. 1504–1509.

To prevail on this point, appellants must show conflict between the state act and the treaty.   Each State, in the absence of any treaty provision conferring the right, may enact laws prohibiting aliens from owning land within its borders.   Unless the right to own or lease land is given by the treaty, no question of conflict can arise.   We think that the treaty not only contains no provision giving Japanese the right to own or lease land for agricultural purposes, but, when viewed in the light of the negotiations leading up to its consummation, the language shows that the high contracting parties respectively intended to withhold a treaty grant of that right to the citizens or subjects of either in the territories of the other.   The right to " carry on trade " or " to own or lease and occupy houses, manufactories, warehouses and shops ", or " to lease land for residential and commercial purposes ", or " to do anything incident to or necessary for trade " cannot be said to include the right to own or lease or to have any title to or interest in land for agricultural purposes.   The enumeration of rights to own or lease for other specified purposes impliedly negatives the right to own or lease land for these purposes.   A careful reading of the treaty suffices in our opinion to negative the claim asserted by appellants that it conflicts with the state act.

But if the language left the meaning of its provisions doubtful or obscure, the circumstances of the making of the treaty, as set forth in the opinion of the District Court (*supra,* 844, 845), would resolve all doubts against the appellants' contention.   The letter of Secretary of State Bryan to Viscount Chinda, July 16, 1913, shows that, in accordance with the desire of Japan, the right to own land was not conferred.   And it appears that the right to lease land for other than residential and commercial purposes was deliberately withheld by substituting the words of the treaty, " to lease land for residential and commercial purposes " for a more comprehensive clause

contained in an earlier draft of the instrument, namely, " to lease land for residential, commercial, industrial, manufacturing and other lawful purposes."

4. The act complained of is not repugnant to § 33 of Article II of the state constitution.

That section provides that " the ownership of lands by aliens . . . is prohibited in ,this State . . .". Appellants assert that the proposed lease of farm land for five years is not " ownership ", and is not prohibited by that clause of the state constitution and cannot be forbidden by the state legislature. That position is untenable. In *State* v. *O'Connell*, 121 Wash. 542, a suit for the purpose of escheating to the State an undivided one-half interest in land, or the proceeds thereof, held in trust for the benefit of an alien, a subject of the British Empire, decided since this appeal was taken, the Supreme Court of Washington held that the statute in question did not contravene this provision of the constitution of that State. The question whether or not a state statute conflicts with the constitution of the State is settled by the decision of its highest court. *Carstairs* v. *Cochran,* 193 U. S. 10, 16. This Court " is without authority to review and revise the construction affixed to a state statute as to a state matter by the court of last resort of the State ". *Quong Ham Wah Co.* v. *Industrial Commission,* 255 U. S. 445, 448, and cases cited.

> *The decree of the District Court is affirmed.*

Mr. Justice McReynolds and Mr. Justice Brandeis think there is no justiciable question involved and that the case should have been dismissed on that ground.

Mr. Justice Sutherland took no part in the consideration or decision of this case.