## LOUIS K. LIGGETT CO. v. BALDRIDGE et al.

District Court, E. D. Pennsylvania. December 8, 1927.

No. 4075.

1. **Injunction ☞85(2)—Equity has jurisdiction to restrain enforcement of unconstitutional penal statute, though no criminal proceedings have been instituted.**

Court of equity is not without jurisdiction to enjoin enforcement of penal act on ground of its unconstitutionality, because no criminal proceedings have been instituted.

2. **States ☞4—Federal courts should refuse to interfere with state laws, except to preserve rights of litigants as citizens of United States.**

Courts of United States should refuse to interfere with laws of the several states, except in so far as it may be necessary to preserve to every litigant his rights as a citizen of the United States.

3. **Constitutional law ☞251—Rights of United States citizen to security of person and enjoyment of property cannot be impaired, except by due process of law (Const. Amend. 14).**

Citizen of the United States has right to security of his person and enjoyment of his property, which cannot be invaded or diminished, except by due process of law under Const. U. S. Amend. 14.

4. **Constitutional law ☞251—State law does not deny due process, if it bears a substantial relation to public interests.**

State law, attacked in federal court as unconstitutional, should be upheld, as not denying

due process of law, if the enactment has substantial relation to the public interests.

**5. Constitutional law ⊝⇒275(1)—Druggists ⊝⇒2—State statute, prohibiting ownership of drug stores by others than licensed pharmacists, held not unconstitutional, as denying due process (Act Pa. May 13, 1927 [P. L. 1009]; Const. U. S. Amend. 14).**

Act Pa. May 13, 1927 (P. L. 1009) supplementary to Act May 26, 1921 (P. L. 1172; Pa. St. Supp. 1924, §§ 9329a1–9329a4), and Act May 17, 1917 (P. L. 208; Pa. St. 1920, § 9301 et seq.), prohibiting ownership "of any pharmacy or drug store" by any one other than a "licensed pharmacist," saving, rights of persons then engaged in business to continue, *held* not unconstitutional, as denying due process of law, under Const. U. S. Amend. 14, or as unreasonable and arbitrary interference with business, in view of public interest involved in ownership of drug stores by competent persons.

**6. Constitutional law ⊝⇒70(3)—Courts are not called on to express opinions on wisdom of legislation.**

Courts are not called on to express opinion as to wisdom of legislation and motives of those prompting it.

In Equity. Suit by the Louis K. Liggett Company against Thomas J. Baldridge and others. On motion for preliminary injunction, and on trial hearing on bill, answer, and proofs. Decrees for defendants.

Roy M. Stearne and Owen J. Roberts, both of Philadelphia, Pa., for plaintiff.

Paul C. Wagner, Deputy Atty. Gen., of Pennsylvania, for defendants.

Before WOOLLEY, Circuit Judge, and DICKINSON and KIRKPATRICK, District Judges, specially sitting.

Sur Motion for Preliminary Injunction.

Sur Trial Hearing on Bill, Answer and Proofs.

DICKINSON, District Judge. We have given this case the above dual subheading, and dispose of the motion for a preliminary restraining order at the request of counsel, who have further stipulated all the facts, that we might likewise dispose of the case on final decree.

### The General Fact Situation.

The Pennsylvania Legislature has passed a series of acts of assembly, each of which has a more or less direct bearing upon this litigation. The beginning may be said to be the Act of May 17, 1917, P. L. 208 (Pa. St. 1920, § 9301 et seq.). This act in effect prohibited the use of the name or title "drug store," or any equivalent designation, in the conduct of any business by any one other than a "registered pharmacist,"

who was restricted to one such "store"; but the prohibition did not extend to any "owner" who employed a "registered pharmacist" to "conduct" the business.

The supplementary Act of May 26, 1921, P. L. 1172 (Pa. St. Supp. 1924, §§ 9329a1–9329a4), prohibited the opening of any "pharmacy" without a permit from the "Pennsylvania Board of Pharmacy," and the board from granting such permit unless the management of the store was in charge of a "registered pharmacist." We follow the phrase of counsel for the plaintiff in the statement that the constitutionality of neither of these acts is under attack.

Then comes the Act of May 13, 1927, P. L. 1009, upon which a most vigorous condemnation is visited. It is entitled "A supplement" to the act of 1917. It opens with a prohibition of ownership of any "pharmacy or drug store" by any one other than a "licensed pharmacist" with a saving (whole or partial) of the rights of those now lawfully engaged in the business to "continue to own," etc., and subjects those violating the provisions of the act to a fine prohibitive in its effect.

A listing of the points of criticism of the act would expand itself into an argument, so we content ourselves with the statement that it is charged to be unconstitutional on the broad grounds of being "an unreasonable and arbitrary" interference with "the plaintiff's business," its freedom of contract, and is likewise said to be an impairment "of the obligation of existing contracts," by which we take to be meant that there is a practical compulsion put upon the plaintiff to default on contracts into which it has entered.

The prayers of the bill are for an ad interim restraining order and final decree preventing the defendants from enforcing the penalties of the act of assembly.

### Conclusions Stated.

The conclusions reached are that the restraining order be refused and the bill be dismissed, with costs, for want of equity.

### Discussion.

We are led to these conclusions by the same line of reasoning, so that they need not be discussed separately.

### Jurisdiction.

[1] A preliminary question is raised, which, in some of its phases, is one of jurisdiction in the broad meaning of that term. The bill is said in this respect in effect to be premature, because, inter alia, no criminal proceed-

ings have been instituted. One of the objections usually urged to bills of this general character is the assumption, as it is termed by courts of equity, of the power to dictate to the courts of criminal law how they are to rule in cases which may come before them. So far as this question is meant to be raised, we think it to have been settled by the case of Foster Cline v. Frink Dairy Co. et al. (not yet reported).

Indeed, to await (so far as this feature goes) an actual prosecution would be at the cost of the right to ask for a restraining order. We are not sure how far these general jurisdictional questions are urged, since the stipulation reached by counsel, but we think they are all set at rest by Terrace v. Thompson, 263 U. S. 197, 44 S. Ct. 15, 68 L. Ed. 255, Southern R. Co. v. Greene, 216 U. S. 400, 30 S. Ct. 287, 54 L. Ed. 536, 17 Ann. Cas. 1247, and Carroll v. Greenwich Ins. Co., 199 U. S. 401, 26 S. Ct. 66, 50 L. Ed. 246.

The stipulation has relieved us of the duty of stating the facts, and we further see no need of distinguishing between the right to continue business at a store being conducted at the time the act of assembly was passed and one opened afterwards. The real question presented is the constitutionality of the Pennsylvania Act of Assembly of May 13, 1927. We accordingly go directly to that statute. A few general observations may serve the purpose of an approach to the question to be decided.

[2-4] There is general accord upon the proposition that the idea of a confederated union of states, which is a feature of our form of government, can be carried out only by refusing interference on the part of the courts of the United States with the laws of the several states, except so far as may be necessary to preserve to every litigant his rights as a citizen of the United States. The rights, which are here invoked, assured to citizens of the United States by the Fourteenth Amendment, must of course be enforced by the courts. Beyond this, however, we cannot go. The security of his person and enjoyment of his property are among the rights of every citizen of the United States, and that the one cannot be invaded, nor he be deprived of the other, otherwise than by what is known as "due process of law," is a broad proposition to which all assent. When, however, the averment is of an encroachment by and under the authority of an act of assembly duly passed by the Legislature of a state, then what is and what is not "due process of law" becomes all-important.

The list of cases dealing with this general theme is a long one, but there is accord in this case upon the thought that the act of assembly should be upheld, if the enactment has a substantial relation to the public interests. We take this to mean that, if there is such relation, the statute cannot be found to be an exercise of the arbitrary power of encroachment upon the personal liberty of any one affected by the law, nor can it be said to be a like arbitrary exercise of the power to take from any one his property. Without attempting any other analysis of the cases, the following, among those cited to us, some by the plaintiff and others by the defendant, may be listed as ruled upon the differentiation to which we have referred: Weaver v. Palmer Bros. Co., 270 U. S. 402, 46 S. Ct. 320, 70 L. Ed. 654; Burns Baking Co. v. Bryan, 264 U. S. 504, 44 S. Ct. 412, 68 L. Ed. 813, 32 L. R. A. 661; Smith v. Texas, 233 U. S. 630, 34 S. Ct. 681, 58 L. Ed. 1129, L. R. A. 1915D, 677, Ann. Cas. 1915D, 420; Cusack v. Chicago, 242 U. S. 526, 37 S. Ct. 190, 61 L. Ed. 472, L. R. A. 1918A, 136, Ann. Cas. 1917C, 594.

[5] This takes us back to the question of whether we are prepared to find that the public has no concern in the business of a drug store or the calling of a pharmacist. If we do so find, we do it with the knowledge, open to all and common to very many, that at one time in all parts of the country, and still in what are called the rural districts, the local pharmacist or druggist serves many of his customers and patrons as their physician. Confidence in his judgment and skill had much to do with this practice; economy had perhaps more. So general was it that the physician of the neighborhood was likewise the druggist. He served the more well-to-do, and those who could not come to him, by visiting them at their homes. He served the others as they came to him at his drug store. They all received the like treatment. The only difference was in the rate of charge, because he took with him his medicines on his rounds of the homes of his patients, just as he gave professional advice and dispensed his medicines to those who came to his store.

It is said that a relatively small part of the business of a drug store is the compounding of medicines and the filling of prescriptions. This is true. There is a type of drug store known as the "cut rate," which perhaps has no prescription counter at all, and scarcely ever more than a nominal one. The medicines and remedies sold are so called "proprietary" medicines. They are none the less as truly "prescribed" by the druggist as are the "filled prescriptions," and are just as

much taken upon the faith and confidence of the user in the druggist as is the medicine "prescribed" by a physician.

We, of course, recognize the force of the argument addressed to us, based upon the distinction between a law which forbade any one other than a skilled pharmacist to compound medicines, and another law which forbade any one other than pharmacists to have a share in the ownership in the business of a drug store. Even here, however, we are unable to say that there is not a substantial relation of ownership to the public interests. The medicines must be in the store before they can be dispensed to those who come to the store for the help which medicines can afford them. What is there is dictated, not by the judgment of the pharmacist, who hands it out to customers, but by those who have the financial control of the business. It may be the Legislature thought that a corporate owner, in purchasing drugs, might give a greater regard to the price than to the quality; and, if such was the thought of the Legislature, can this court say it was without a valid connection with the public interests, and so unreasonable as to be unlawful? How that matter affects the public interest is illustrated by another kind of business.

A number of years ago the business of *selling liquor was wholly in the hands of* those who sold it. Innkeepers and tavern keepers stood high in the respect of their neighbors. The practice grew up of brewers and distillers taking over the ownership of places where intoxicating liquors were sold. The saloon, when ownership and management became separated, soon became a nuisance and a menace, so that its abolishment was demanded, and no one at any time would wish to witness its return.

A saloon is, of course, not a drug store; but the point is that the provisions of this act can no more be said to have no substantial relation to the public intersts than a law would have been which, with the object of preventing nuisances, forbade any one but tavern keepers themselves from having a financial interest in the tavern keeping business. That financial ownership, interest, and managerial sense of responsibility each have a relation to a wise public policy, and hence to the public interest, is evidenced by the experience of the courts in Pennsylvania upon whom was thrust the responsibility of granting liquor licenses. Every judge who had to do with this duty was soon brought to realize the element of danger to the public conduct of taverns and saloons the moment the profits from the sales of liquor went to owners who were removed from and had no sense of the responsibility of management.

There enters into every business the two motives of a wish for profit and a sense of duty obligation towards those with whom the management deals. When these are joined, the latter operates to some extent; the moment they are separated, the former is in sole control. This thought deals with the relation between things which should be joined and the public policy of not permitting them to be separated. There is likewise the thought of things which should not be joined. The Act of Assembly of June 9, 1881, providing that no license to sell intoxicating liquor be granted to the owner of a place of amusement, *is an illustration*. The relation to the public interests is, of course, here more direct, and the recognition of it in legislation more common, but in principle the two legislative acts are alike.

[6] Because of our inability to make the finding that the instant act of assembly has no substantial relation to the public interest, we cannot hold it to be unconstitutional. What opinion may be entertained of the wisdom of much of the legislation of this general character, and of the motives of those who have prompted it, the courts are not called upon to express.

Decrees in accordance with this opinion may be submitted.